IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-CV-1922

AMBROSE CRUZ,
SARA FITOURI,
JACQUELYN PARKINS,
YOUSSEF AMGHAR,
ANDY SANNIER,
FRANCESCA LAWRENCE,
KELSEY TAYLOR,
individually and on behalf of a class of similarly situated persons,

      Plaintiffs

v.

CITY AND COUNTY OF DENVER, COLORADO,
DOES 1-10,

      Defendants.

---

## CLASS ACTION COMPLAINT AND JURY DEMAND

---

Now come Plaintiffs, Ambrose Cruz, Sara Fitouri, Jacquelyn Parkins, Youssef Amghar, Andy Sannier, Francesca Lawrence, and Kelsey Taylor, through their attorneys, LOEVY & LOEVY, and hereby complains of Defendants City and County of Denver, Colorado, and Does 1-10, as follows:

### INTRODUCTION

1.    This action arises out of protests in Denver and across the nation following the murder of George Floyd on May 25, 2020, by Minneapolis police officers. The events in Minneapolis brought out millions of people around the

country at once to peacefully protest the deaths of Black and Brown people by law enforcement and vigilantes condoned by local law enforcement as well as the systemic racism that oppresses Black, Indigenous, and people of color. Despite the COVID-19 pandemic, thousands of people came out to demonstrate in Denver and elsewhere in Colorado.

2.      Although the protests were overwhelmingly peaceful, the Denver Police Department ("DPD") and officers from other agencies in DPD's mutual-aid network (collectively, "Defendant Officers") used violent crowd control tactics against these peaceful protestors. Over the course of several days, the Defendant Officers deployed constitutionally unlawful crowd control tactics, including kettling, indiscriminate and unwarned launching of tear gas and flashbangs into crowds and at individuals, and shooting projectiles at protestors. These protestors included many young Black and Brown people.

3.      Defendant Officers knowingly placed these protestors in physical danger through indiscriminate use of excessive force.

4.      Not only did this excessive use of force injure many protestors, journalists, and bystanders, but it chilled individuals from exercising their First Amendment rights and suppressed speech.

5.      Defendant Officers targeted journalists and others simply documenting their conduct. They targeted medics who were seeking to give aid to those harmed.

6.     Although the protests were overwhelmingly peaceful, the DPD arrested over 350 people over the course of several days beginning on May 28, 2020, the first day of the protests in Denver.

7.     For numerous days beginning on May 28, 2020, Defendants used methods of "less-lethal" force to discourage and suppress peaceful protest in public places (including streets, sidewalks, and parks) in Denver, particularly in the downtown area.

8.     The actions of the Defendant Officers and the Defendant City infringed on the rights of protestors, journalists, and bystanders to be free from unreasonable seizures and use of force under the Fourth and Fourteenth Amendments.

9.     The purpose and effect of this excessive use of force was to prevent, deter, and suppress protestors from exercising their First Amendment right to exercise freedom of speech, peaceably assemble, and petition for redress of grievances.

10.     In addition, the Defendant City imposed a citywide nighttime curfew from May 30 through June 4, 2020 and arrested protestors for violating this curfew. These actions violated protestors' rights under the First, Fourth, and Fourteenth Amendments.

11.     Plaintiffs bring this action seeking to restrain the Defendant City of Denver and DPD from further violence and unconstitutional conduct, and seeking damages on behalf of themselves individually and others similarly situated to them.

## Jurisdiction

12.     This court has jurisdiction of this action pursuant to 28 U.S.C. § 1331.

13.     Venue is proper under 28 U.S.C. 1391(b). All parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred in this judicial district.

## The Parties

14.     Plaintiff Ambrose Cruz is a freelance journalist and photographer and a resident of Denver, Colorado.

15.     Plaintiff Sara Fitouri is a lawyer and resident of Denver, Colorado.

16.     Plaintiff Jacquelyn Parkins is a union organizer and resident of Denver, Colorado.

17.     Plaintiff Andy Sannier is a software engineer and resident of Denver, Colorado.

18.     Plaintiff Francesca Lawrence works with youth in the juvenile justice system and is a resident of Denver, Colorado.

19.     Plaintiff Kelsey Taylor is a small business owner and a resident of Denver, Colorado.

20.     Plaintiff Youssef Amghar is a former U.S. Marine and resident of Denver, Colorado.

21.     Defendant City and County of Denver (the "City") is a Colorado municipal corporation. The DPD is an agency of the Defendant City, and all actions of the DPD are the legal responsibility of the City. The City is sued on the basis of

its policies, customs, and practices which gave rise to Plaintiffs' federal rights claims.

22.    At all material times herein, the City was responsible for supervising, enacting, and enforcing the DPD's conduct, policies, and practices; the absence of necessary policies and practices; and for the hiring, retention, supervision, and training of employees and agents of the DPD.

23.    The City requested the assistance of other law enforcement agencies in responding to the protests. Thus, the City was also responsible for the actions of the to-be-identified members of its mutual-aid network.

24.    Plaintiffs are informed, believe, and thereupon allege that Does 1 through 10 were the agents, servants, and/or employees of the DPD or officers of other jurisdictions who were acting with the authorization of the DPD. Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as Does 1 through 10, inclusive, and therefore sue these Defendants by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. The individual Doe Defendants are sued in both their individual and official capacities. They are henceforth referred to as the "Defendant Officers."

25.    Plaintiffs are informed, believe, and thereupon allege that at all times relevant hereto Does 1 through 10, in addition to the named Defendants, are responsible in some manner for the damages and injuries alleged herein.

26.    Plaintiffs are informed, believe, and thereupon allege that at all times relevant hereto Defendants, and each of them, were the agents, servants, and/or

employees of the other Defendants and were acting at all times within the scope of their agency or employment and with the knowledge and consent of their principal or employer. At all times Defendants were acting under color of law.

27.     The acts and omissions of all Defendant Officers were at all material times pursuant to the customs, policies, practices, and/or procedures of the Defendant City and DPD.

## Factual Background

28.     On Monday, May 25, 2020, a Minneapolis police officer brutally murdered George Floyd, an unarmed and non-resisting Black man, while other police stood by and watched.

29.     Innumerable people held peaceful protests across the world condemning police brutality and systemic racism in the wake of the state sponsored and/or sanctioned/excused murders of George Floyd, Breonna Taylor, Ahmaud Arbery, Elijah McClain, Tony McDade, and countless others.

30.     These constitutionally protected and essential protests occurred amid an unprecedented public health crisis. Novel coronavirus, COVID-19, has killed over 125,000 Americans and continues to spread. The virus is commonly understood to be transmittable through exposure to respiratory droplets. Public health and government officials, including in Denver, have advised people to wear masks if they were outside and to stay six feet apart.

31.     At or around 5:00 p.m. on May 28, 2020, protestors gathered at the Colorado State Capitol in downtown Denver to protest police brutality and racism

against Black people in the United States. Protestors carried signs, chanted, and knelt. Hundreds of protestors were present.

32.    Thousands of protestors assembled to demonstrate in Denver every day for many days.

33.    Protestors frequently assembled at the Colorado State Capitol building, but they also marched down streets, primarily in the downtown Denver area. During the protests, the Defendants employed violent crowd control tactics to corral, intimidate, and suppress the speech of protestors. Defendant Officers used a variety of "less-lethal" weapons, including tear gas, flashbang grenades, pepper balls, rubber bullets, and other projectiles fired directly at protestors. Defendant Officers used these tactics on protestors who were demonstrating peacefully, without first issuing warnings, lawful (or any) orders, or giving them adequate time to disperse.

34.    Tear gas is a general term for aerosolized chemical agents. Tear gas generally includes CS (o-chlorobenzylidene malonitrile) and OC (oleoresin capsicum). Tear gas activates pain receptors and leads to intense burning pain in the eyes, throat, lungs, skin and mucus membranes. It also causes disorientation, severe coughing, crying, and difficulty breathing.

35.    Defendants also used kinetic impact projectiles ("KIPs") during the protests on peaceful protestors. The DPD uses 40mm launchers to shoot KIPs as well as flashbang grenades. The 40mm launchers shoot projectiles at a speed of 90 to 100 miles per hour.

36.     KIPs refers to a range of projectiles used in crowd control settings that are made from combinations of rubber, plastic, PVC, various metals, wood, hard foam, and wax, which are often generically referred to as "rubber bullets." These include foam batons and rubber pellets.

37.     KIPs frequently cause contusions or welts.When shot at close range, KIPs can cause serious bodily injury or death. When shot from farther range, they have reduced accuracy.

38.     In addition, the use of riot control face gear make the targeting of these weapons even more difficult.

39.     Pepper ball guns, which are air-powered launch devices that fire rounds containing plastic sphere projectiles filled with OC powder. These spheres explode OC powder onto the person who gets hit, causing the person to struggle to breathe.

40.     Pepper balls and pepper spray have an immediate and incapacitating effect that creates a burning sensation to any exposed skin.

41.     Flashbang grenades are explosives that make a loud noise and/or flash of light, and are made to temporarily blind and/or deafen people and disorient them.

42.     Over the course of several days, beginning on May 28, 2020, Defendant Officers shot tear gas, pepper balls, flashbang grenades, and KIPs at groups of largely peaceful protestors near the Capitol and in the downtown Denver area. They used these weapons indiscriminately and without warning, even at times when the crowd was merely chanting, kneeling or standing with their hands up. Many people

were hit with projectiles and thousands inhaled tear gas or suffered pain and burning in their eyes, nose, mouth and throat from pepper balls and tear gas used by the officers.

43.   Defendant Officers also used "kettling" as a tactic against the protestors. Kettling, which derives from a German military term referring to an army surrounded by a much larger force, is a police tactic whereby officers confine a large group of people to a designated space by surrounding them on all sides so that there is no escape. By doing so, the officers effectively control people's movements.

44.   Kettling leads to the unlawful seizure of people without a reasonable basis, creates panic, elevates tensions, and chills speech. Defendant Officers accomplished this by forming police lines around protestors. They also kettled protestors before using "less-lethal weapons" on them such as tear gassing, pepper spraying, flashbanging, and shooting rubber bullets at them.

45.   On Friday, May 29, 2020, peaceful protestors again gathered at the Capitol. Defendants near the protest site at the Capitol wore riot gear. Protestors chanted, "Why are you in riot gear, I don't see no riot here." Without provocation or warning, Defendant Officers fired "less-lethal" weapons into the crowd of protestors. Throughout the hours that followed, Defendant Officers continued to engage in other violent and intimidating tactics, including shooting protestors who were kneeling and chanting with their hands up.

46.   Defendant Officers also used "less-lethal" weapons on members of the press as well as individuals recording or photographing their activities.

47.     On Saturday, May 30, 2020, peaceful protestors assembled at the Capitol in the afternoon. In response and over the next several hours, Defendant Officers intimidated protestors with "less-lethal weapons." Some Defendant Officers fired projectiles or pepper balls or pepper spray directly at protestors' heads and faces. Other Defendant Officers fired at protestors while hanging off of the side or back of moving police vans or trucks. Defendant Officers also shot "less-lethal" weapons at protestors peacefully kneeling on the ground and chanting.

48.     On May 30, 2020, at around 1:00 p.m., the Mayor of Denver declared an "emergency" and announced a curfew order for the entire city, set to begin at 8:00 p.m. that evening. The curfew was issued while thousands of individuals peacefully marched and demonstrated in Denver.

49.     The curfew was imposed in all public places within the City and County of Denver, including streets and public rights-of-way, from 8:00 p.m. on May 30, 2020 to 5:00 a.m. on Sunday, May 31, 2020, and from 8:00 p.m. on May 31, 2020 until 5:00 a.m. on June 1, 2020.

50.     On June 1, 2020, the Mayor of Denver extended the curfew for four more days. The curfew was in effect each night from 9:00 p.m. to 5:00 a.m. on the evenings of June 1, 2, 3, and 4, 2020.

51.     During the curfew hours, "all persons" were "prohibited from using, standing, sitting, traveling or being present on any public street or in any public place, including for the purpose of travel," with certain exceptions. However, there was no exception for First Amendment activity.

52.     A violation of the curfew order was a criminal violation punishable by a fine up to $999.00 or imprisonment up to 300 days.

## Factual Allegations Relating to Plaintiffs

## Plaintiffs Sara Fitouri and Jacquelyn Parkins

53.     Plaintiffs Sara Fitouri and Jacquelyn Parkins participated in the protests every day beginning on May 28, 2020 for numerous days. They attended to protest police brutality against Black and Brown people.

54.     On or around 5:00 p.m. on May 28, 2020, Parkins went to the Capitol building and participated in the protests. When some of the protestors began marching north, Fitouri joined Parkins as Parkins marched with them. The protest was peaceful.

55.     Fitouri and Parkins marched through Confluence Park toward I-25 with the rest of the marchers. On or around 7:00 p.m., they observed the Defendant Officers fire dozens of pepper balls on the group of protestors on the highway. At that time, Fitouri and Parkins were on a pedestrian walkway over I-25. They inhaled pepper spray from the pepper balls while on the walkway. When they rejoined the march heading back downtown, they inhaled tear gas and/or pepper spray that Defendant Officers had used on protestors in that area.

56.     On or around 1:00 p.m. on May 29, 2020, Fitouri and Parkins arrived at or near the Capitol to join the protest and march. They marched with the other protestors, who were peaceful. The march went to several locations, including the City and County Building and the jail.

57.     At approximately 8:00 p.m., Fitouri and Parkins and other protestors were at the intersection of Colfax and Broadway. The group was peaceful. Someone in the group may have lofted a water bottle into the air. Rather than investigate and isolate that person, Defendant Officers indiscriminately opened fire with tear gas and pepper balls at the entire group of protestors, including Fitouri and Parkins, without warning or order to disperse.

58.     Once the initial pepper spray rounds were fired, the Defendant Officers continued to use pepper balls, tear gas, and flashbang grenades on the protestors, including Fitouri and Parkins, from the corner of Broadway and Colfax, as well as multiple other locations on and around the Capitol.

59.     At one point, the Defendant Officers used pepper balls, tear gas, and flashbang grenades to push protestors southeast of the Capitol into the surrounding neighborhoods. Fitouri and Parkins, along with another group of protestors, inhaled significant amounts of pepper spray and tear gas during this offensive move. Fitouri and Parkins saw many injured protestors at this time, including one woman who was unable to see or breathe and was caught in the gas.

60.     The Defendant Officers did not close any of the streets and their actions pushed protestors into active oncoming traffic.

61.     Fitouri and Parkins left the protest on or around 10:30 p.m., after experiencing significant exposure to tear gas fired by Defendant Officers very close to their persons. Defendant Officers used pepper balls, teargas, and flashbang

grenades on protestors consistently throughout the evening and were still using pepper balls, tear gas, and flashbang grenades at the time Fitouri and Parkins left.

62.   The Defendant Officers used pepper balls, tear gas, and flashbang grenades across Colfax while the street was filled with traffic waiting at the red light. Many cars had pepper balls, tear gas, and flashbang grenades hit their cars or the ground immediately next to the cars.

63.   On the evening of May 29, 2020, Fitouri and Parkins also observed that Defendant Officers indiscriminately shot tear gas and/or pepper balls at the entire group of protestors anytime protestors moved within approximately 15 feet of the Officers.

64.   Defendant Officers never gave any warnings or dispersal orders before shooting tear gas and/or pepper balls at protestors.

65.   Defendant Officers shot tear gas and/or pepper balls at peaceful protestors who were kneeling on many occasions. Many of these protestors had their hands in the air and their shirts off.

66.   At many points in the evening of May 29, 2020, when Fitouri and Parkins and other peaceful protestors were on the Capitol steps with their hands up, chanting "Hands up, don't shoot," Defendant Officers fired flashbang grenades, tear gas, and pepper balls into the crowd indiscriminately and without warning or orders.

67.     On the evening of May 30, 2020, Parkins saw Defendant Officers hanging off the sides of police trucks and shooting at protestors as fast as they could.

68.     On or around 4:00 p.m., Fitouri and Parkins arrived at the Capitol building for the evening protests prior to the start of curfew. They began at the west steps of the Capitol building.

69.     Before curfew that day, a Defendant Officer on Colfax north of the protestors threw a flashbang grenade into the crowd, which exploded at Fitouri's foot. Fitouri's foot went numb and she suffered minor burns.

70.     The Defendant Officers had also shot tear gas, flashbang grenades, and/or pepper spray into the crowd of protestors without warning or dispersal orders. A friend of Fitouri's and Parkins's was very badly gassed.

71.     There was no warning about enforcement of the curfew before the curfew. Instead, at 8:00 p.m., Defendant Officers came out of the Capitol building and launched tear gas, flashbang grenades, and/or pepper spray at the protestors, including Fitouri and Parkins, indiscriminately and without warning or dispersal orders.

72.     Fitouri and Parkins then marched with a group of protestors. Southeast of the Capitol, Defendant Officers began shooting pepper balls at the protestors without warning or giving any dispersal or other orders. Fitouri and Parkins were with a group of approximately 30 people who ran into an alley in order to avoid being hit. Defendant Officers chased the protestors both on foot and

on SWAT vehicles into the alley in order to trap them and continue shooting at them. Fitouri was hit with pepper balls. Eventually, Fitouri and Parkins were able to get to their cars to leave.

73.     At the time that Fitouri and Parkins were present in public places in Denver after curfew on May 30, 2020, the Defendant Officers "enforced" the curfew against them and other protestors by shooting pepper balls or throwing tear gas at them and/or chasing them into alleys in order to use "less-lethal" weapons on them.

74.     The Defendant Officers did not give any warnings or dispersal orders and appeared only interested in intimidating and punishing protestors with their "less-lethal" weapons.

75.     Fitouri and Parkins saw many non-protestors present in public places in Denver after curfew on May 30, 2020 who were ignored by the Defendant Officers and were not shot at, tear gassed, pepper sprayed, or arrested.

76.     After they left the protest, Fitouri and Parkins returned to their place of work at 15th Avenue and Grant Street where their cars were parked, in order to go home. Plaintiff Youssef Amghar was with them. They were standing in a private parking lot of their workplace. A group of protestors came by. Suddenly, one or more police vehicles screeched to a halt, many Defendant Officers got out of their vehicles and began shooting pepper balls and/or tear gas at the protestors without warning or dispersal orders. Plaintiffs attempted to hide behind their own vehicles. The Defendant Officers shot at them and other protestors running through the parking lot from approximately 20 feet away.

77.     On Sunday, May 31, 2020, in the early evening, Fitouri and Parkins met at the Capitol to join the protest, which was peaceful. They marched with the other protestors.

78.     After the 8:00 p.m. curfew, when Fitouri and Parkins and the protestors marched by the police precinct on Washington and Colfax, Defendant Officers intentionally allowed half the group to pass and then began tear gassing, flashbanging, and pepper spraying the middle of the protest march. There were likely several thousand protestors in the march at this time.

79.     One of their friends was hit three times with tear gas canisters, once in his head, once in his back, and once in his hand. He was seriously injured and immediately left to seek treatment at a nearby hospital.

80.     At one point on that evening, Fitouri and Parkins were near the Basilica at 15th Avenue and Grant Street with at least 100 other protestors. Defendant Officers kettled the protestors. Indiscriminately and without warning or orders, Defendant Officers shot tear gas, flashbang grenades, and pepper balls into the crowd from every direction. It was difficult for protestors to escape.

81.     On days when they attended protests in Denver and during the events described above, Fitouri and Parkins experienced tear gas and/or pepper spray on numerous occasions, as described above, which caused coughing, difficulty breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the skin.

### Plaintiff Andy Sannier

82.     Plaintiff Andy Sannier participated in the protests from May 28, 2020 to June 7, 2020. He attended to protest police brutality against Black and Brown people, provide eyewash, food and water to protestors, and to be a witness.

83.     On May 28, 2020, Sannier joined the protests at around 5:00 or 6:00 p.m. He marched with other peaceful protestors near the Capitol and on streets downtown. They marched to I-25, but Sannier did not get on I-25. He saw Defendant Officers tear gassing people on I-25, and bystanders who were on the pedestrian bridge were exposed to massive doses of tear gas and/or pepper spray.

84.     Within two hours of joining the protests on that first day, Sannier had been pepper sprayed.

85.     During all the days that Sannier attended the protests, he never heard any Defendant Officers say anything to protestors before using "less-lethal" weapons on them. The only time that he heard an officer say anything was when he was arrested on June 1, 2020 for curfew violation and the officer tackled him to the ground, saying words to the effect of "Get on the fucking ground!"

86.     On May 29, 2020, Sannier protested with other peaceful demonstrators in downtown Denver. At one point, there were lines of Defendant Officers facing protestors, who were yelling at them, but were peaceful. Defendant Officers repeatedly deployed tear gas on the protestors at no provocation, without warning. The chant that most often preceded a tear gassing was "Why are you in riot gear? I don't see no riot here."

87.     When Sannier was walking home downtown that evening, he saw a Black man yelling at (but not threatening) Defendant Officers. A white couple started arguing with the Black man who was yelling at the Defendant Officers. Sannier recorded this with his cell phone from a comfortable distance. The Defendant Officers opened fire on the people arguing, and, seeing that Sannier was filming, shot him in the chest with a pepper ball.

88.     On May 30, 2020, at approximately 4:00 p.m., Sannier marched with other peaceful protestors in the downtown area. There were approximately 1,000 protestors. While Sannier and other protestors were near the 16th Street Mall, between California and Welton, Defendant Officers began shooting pepper balls at the protestors. There was no provocation by the protestors. At the time, Sannier and other protestors were kneeling before the Officers and chanting "Hands up, don't shoot," and other protestors were laying down in front of him.

89.     Sannier saw many non-protestors present in public places in Denver after curfew on one or more days when the curfew was in effect who were ignored by the Defendant Officers and were not shot at, tear gassed, pepper sprayed, or arrested.

90.     On June 1, 2020, Sannier joined other protestors who marched downtown. Sannier was with a few hundred other protestors on the Capitol lawn until midnight. The protest was peaceful.

91.     At midnight, dozens of Defendant Officers came out of the shadows at the Capitol, and protestors began chanting, "Why are you in riot gear, I don't see no riot here."

92.     Sannier laid down in the street with other people linking arms. There were also protestors demonstrating against the police in a line.

93.     Defendant Officers began marching onto the lawn. Without any warning or dispersal order or any words, the Defendant Officers began tear gassing the demonstrators. Defendant Officers also used a noise cannon or some weapon that created an irregular strobing sound that was extremely disorienting. Sannier left.

94.     When Sannier got to Lincoln and Broadway, there were approximately 50 Defendant Officers there. The Officers surrounded Sannier and other medics, in a corner and began dousing them with pepper spray. The medics in front of Sannier were wearing gear clearly identifying them as medics.

95.     Sannier was tackled from behind by a Defendant DPD Officer. He was arrested for curfew violation and failure to obey a lawful order (curfew).

96.     Sannier was handcuffed and placed into a police van. There was a younger protestor next to him who was also handcuffed and who was sobbing, saying he could not breathe and needed his inhaler. Sannier tried to get him to calm down. The younger protestor asked the Officers for his inhaler; the Officers heard him and opened and closed the door numerous times, but they ignored him.

97.     Sannier was detained in the jail for approximately 36 hours.

98.     In jail, he saw another protestor who had a giant bruise under his eye from being hit by a projectile. That protestor waited at least 12 hours before receiving ice for his injury.

99.     On one or more days when he attended protests in Denver and during the events described above, Sannier experienced tear gas and/or pepper spray on numerous occasions, as described above, which caused coughing, difficulty breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the skin.

### Plaintiff Kelsey Taylor

100.    Plaintiff Kelsey Taylor protested on May 28 and 30, 2020 and other days. She wanted to protest the murder of George Floyd.

101.    On May 28, 2020, Taylor marched with protestors in the downtown area and north towards I-25. After the protestors got off the highway, protestors headed back towards the Capitol. There were over 100 people. Around Platte and the pedestrian bridge near Confluence Park, protestors stood there. Taylor heard one Officer say something to the effect of, "If anyone moves, light 'em up." Defendant Officers began shooting pepper balls at the protestors without warning or any orders. Many people were injured.

102.    Taylor marched back to the Capitol with other protestors. At 14th Avenue and Sherman, there was a line of Defendant Officers on 14th Avenue.

103.    Taylor and the other protestors stayed there about another hour, chanting, "Hands up, don't shoot," and "I can't breathe." Another group of protestors

walked down 14th Avenue and joined Taylor's group of protestors. There were approximately 200 people.

104.    At some point, the Defendant Officers tear gassed the entire crowd, without provocation. Taylor did not see anyone throw anything or get aggressive with the police. Defendant Officers gave no warning or orders. Taylor inhaled tear gas, which caused breathing and vision problems.

105.    On May 30, 2020, Taylor went to the Capitol at around 5:00 or 6:00 p.m. to protest. She stood with other peaceful protestors on 14th Avenue in front of the Capitol building. Any time there was the slightest agitation in the crowd, even if it was non-violent, the Defendant Officers started shooting pepper balls and throwing tear gas without giving any warnings or orders. The Defendant Officers also shot into the crowd whenever protestors walked forward closer to Colfax. Taylor was hit by pepper balls, which caused bruises. She also inhaled tear gas.

106.    After curfew, at 14th Avenue and Broadway by the public library, Taylor was with approximately 100 other demonstrators protesting the curfew itself. Taylor and the other demonstrators knelt in the intersection of 14th Avenue and Broadway. The Defendant Officers formed a line. They were in full riot gear and had batons and/or truncheons. They advanced towards the protestors. Taylor and the others remained kneeling. They began jabbing people, including Taylor, with batons.

107.    Taylor saw one Defendant Officer hit a Black man across his chest with his baton. Taylor said words to the effect of, "You can't do that, he's not

hurting you, he's unarmed." Another Defendant Officer grabbed Taylor's arm and told her that she was under arrest. Taylor heard another officer say, "Get me three more."

108.  After Taylor's arrest by DPD for violating curfew, she was eventually put into a police van. It was very hard for her to breathe because she has asthma and had been hit by tear gas and pepper balls.

109.  Taylor was taken to jail. She was released from jail the next morning.

110.  On one or more days when she attended protests in Denver and during the events described above, Taylor experienced tear gas and/or pepper spray on numerous occasions, as described above, which caused coughing, difficulty breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the skin. Inhaling tear gas was especially difficult for Taylor because she has asthma.

### Plaintiff Francesca Lawrence

111.  Plaintiff Francesca Lawrence participated in the protests on May 30 and 31, 2020. She went to the protests to be a medic and try to help protestors who were injured.

112.  On May 31, 2020, Lawrence went out at around 8:00 p.m., after curfew, in order to help protestors because she believed that the violence against the protestors would be worse after curfew.

113.  Lawrence went to Colfax, near downtown. For about the first hour, things were calm. However, Defendant Officers then began shooting tear gas and

pepper spray at the peaceful protestors and people ran. The Defendant Officers did not give any warnings or dispersal orders before using their "less-lethal" weapons on the protestors.

114.   Lawrence tried to leave because she did not feel safe anymore and was trying to find her way back to her car. She heard a bunch of other protestors screaming and running behind her, and they got cornered in an alley at 10th Avenue and Acoma by approximately 10-15 Defendant Officers.

115.   The Defendant Officers shot a tear gas canister into the alley. The Defendant Officers shot "less-lethal" weapons at the protestors at very close range. The Defendant Officers shot people who were standing up against the wall.

116.   Lawrence was tear gassed and pepper sprayed with the other protestors. This caused coughing, difficulty breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the skin.

117.   Lawrence was arrested by Defendant DPD Officers for curfew violation and failure to obey lawful order (curfew).

118.   There were approximately 20-25 people arrested at the same time at that location.

119.   Lawrence was transported to the jail in a van. The Officers had taken people's masks away.

120.   At the jail, there were many people in holding cells, but their masks had been taken away and the jail did not provide masks at that point.

121.   At the jail, Lawrence saw a protestor whose thigh was black and blue from being hit by a rubber bullet; one who had been beaten by a baton before her arrest; and another who had been hit in the face with a projectile and his face was covered in blood.

122.   Lawrence was released from jail on the morning of June 2, 2020.

123.   Lawrence saw many non-protestors present in public places in Denver after curfew on May 31, 2020 who were ignored by the Defendant Officers and were not shot at, tear gassed, pepper sprayed, or arrested.

### Plaintiff Youssef Amghar

124.   Plaintiff Youssef Amghar participated in the protests on May 30 and 31, 2020. Amghar wanted to protest police brutality against Black and Brown people.

125.   On May 31, 2020, well before curfew, Amghar was with other peaceful protestors on the corner of Colfax and Lincoln. Protestors were chanting, "Hands up, don't shoot," and holding signs. Amghar was standing on the sidewalk. There was a line of Defendant Officers on Colfax. Amghar stood there with their hands up. Someone else not near them in the crowd threw a water bottle at the officers. The Defendant Officers immediately began shooting into the crowd with pepper balls. They did this without warning or giving any orders.

126.   At first, the Defendant Officers shot indiscriminately into the crowd, but after the crowd moved back, they began shooting directly at Amghar, even though they were standing still with their hands up. The Defendant Officers first

24

shot them in the arms and legs, then in the chest, and then directly in the face, even though they continued standing still with their hands up. The Defendant Officers shot them approximately 14 times.

127.   The Defendant Officers did not give any orders before, during, or after this incident. No one told Amghar to move back or gave them any other orders.

128.   Amghar was so upset at the Defendant Officers' use of force on them that they began yelling words to the effect of, "I'm a goddamn U.S. Marine, what are you doing?" Then the Defendant Officers began throwing tear gas canisters at their feet. After a couple minutes, Amghar walked away and took cover behind a tree.

129.   After curfew, in a different location, Defendant Officers kettled Amghar with other protestors and then opened fire with pepper balls without giving any orders or warnings.

130.   Defendant Officers also chased Amghar and other protestors into alleys, trying to force them into places where they were cornered, so that they could shoot "less-lethal" weapons at them.

131.   On one or more days when they attended protests in Denver and during the events described above, Amghar experienced tear gas and/or pepper spray on numerous occasions, as described above, which caused coughing, difficulty breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the skin.

**Plaintiff Ambrose Cruz**

132.    Plaintiff Ambrose Cruz went to the protests on June 1, 2020. As a photographer and freelance journalist, he wanted to document the protests as well as the police response. He has also been the victim of police violence in the past. Throughout the evening, he documented the protests and police action as a photojournalist.

133.    Cruz went out to document the protests on June 1, 2020 at about 8:00 p.m. He was with protestors in front of the Capitol. The protestors were chanting and peaceful. There were over 100 people present. There was a line of Defendant Officers present on all sides of the protestors, surrounding them.

134.    Sometime after 9:00 p.m., Defendant Officers moved in and began rapidly shooting tear gas and foam bullets at the protestors. They did not give any warning or orders. Because the police had surrounded the protestors on all sides, it was difficult for protestors to escape.

135.    Cruz ran away from the gas. At approximately 13th Avenue, he saw a man in an electric wheelchair. The man was stuck and Cruz tried to give him a hand. However, the wheelchair was extremely heavy. Unfortunately, Cruz had to leave him there while he was being engulfed by tear gas.

136.    Cruz ran towards the library. Around 13th Avenue, the Defendant Officers were shooting at him and protestors with tear gas and pepper balls. There were a lot of people who were trying to leave to go home.

137.   There were approximately 35 people at that corner, and they were all younger protestors, including teenagers. Almost all of them were Black. One protestor was having a seizure. Cruz and others tried to help him.

138.   Some people tried to leave, but Defendant Officers cornered them and shot pepper balls at them. A white person went up to the Defendant Officers to ask if they could leave because people wanted to go home. The Defendant Officer said that they could go home, and so people started walking towards where the officer told them to go. That officer started firing on people and everyone started running.

139.   Cruz ran with other protestors to a building and garage at 13th Avenue and Lincoln. The Defendant Officers ran after them. The Defendant Officers were shooting them with pepper balls. They did not give any orders or warnings.

140.   Cruz and others ran down to the garage but discovered that both ends of the block were blocked off by armored vehicles and there was no exit. Cruz ran up the stairs, and as he looked up, a Defendant DPD Officer shot him in the face with pepper balls. The Defendant DPD Officer hit him three times in the eye area and knocked his glasses off.

141.   A female Defendant DPD Officer told him, "If you don't fucking get on the ground, I'm going to fucking kill you," or words to that effect. Even though Cruz stopped and was on the ground, the other Defendant DPD Officer continued firing pepper balls at him, including at the back of his head.

142.   Cruz was placed in handcuffs. The Defendant DPD Officer who had been repeatedly firing pepper balls at Cruz at close range taunted him, saying

27

things like, "What happened to you? It looks like your wife beat you. I'd say that was two days old, this must have happened another night."

143.   Cruz's eye was bleeding, swollen shut, and bruised. He could not open his eye. A month after the attack, he still has light sensitivity and other problems with his eyesight.

144.   Cruz was arrested for curfew violation and failure to obey lawful order (curfew).

145.   He was detained in the jail overnight.

146.   On one or more days when they attended protests in Denver and during the events described above, Cruz experienced tear gas and/or pepper spray on numerous occasions, as described above, which caused coughing, difficulty breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the skin.

## Class Allegations

147.   **Class Definition, Rule 23(b)(2), Injunctive Relief Class:** This class is defined as all persons who have in the past participated, presently are participating, or may in the future participate in, or be present at, demonstrations within the City and County of Denver in the exercise of their rights of free speech, press, assembly and petition in general, and particularly as it relates to protesting police violence and discrimination against people of color, especially Black people.

148.   **Class Definition, Rule 23(b)(3):** One or more of the named Plaintiffs (which are indicated for each class or subclass) bring this action individually and on

behalf of a proposed class of all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(1), (b)(2), and (b)(3). These classes are defined as:

a.   **Direct Force Class:** Beginning May 28, 2020, and continuing until judgment or other resolution of this case, all persons present at or during the aftermath of protests in the City and County of Denver, who were shot with so-called "less-lethal weapons" and/or inhaled an aerosolized chemical agent (including, but not limited to, CS or OC). The Class Representatives for this class are Ambrose Cruz, Youssef Amghar, Sara Fitouri, Jacquelyn Parkins, Francesca Lawrence, Kelsey Taylor, and Andy Sannier.

b.   **Arrest Class:** Beginning May 28, 2020, and continuing until judgment or other resolution of this case, all persons present at or during the aftermath of protests in the City and County of Denver, who were arrested by the DPD on charges of violating curfew. The Class Representatives for this class are Ambrose Cruz, Francesca Lawrence, Kelsey Taylor, and Andy Sannier.

149.   Plaintiffs and the putative class were subjected to the constitutional violations described in this complaint. The legal and factual issues are common to the class and affect all class members.

150.   Plaintiffs reserve the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery.

29

## Numerosity

151.    Each class is inclusive of people present to protest and those otherwise present in the vicinity as bystanders, journalists, or medics. Consistent with Federal Rule of Civil Procedure 23(a), the members of the class are so numerous that joinder of all members is impracticable. The Injunctive Relief Class is composed of thousands of people. The Arrest Class exceeds 300 people. The Direct Force Class consists of more than 1,000 people.

## Common Issues of Fact or Law

152.    Although the actions complained of in this Complaint occurred at different times and locations, Defendants acted uniformly with respect to each class. For example, Defendants consistently tear gassed and shot projectiles at peaceful protestors without warning, orders, or any lawful justification.

153.    Plaintiffs are informed and believe and thereon allege that the DPD officers and those officers assisting them pursuant to their mutual aid network acted in accordance with orders given by supervisors from the highest command positions, in accordance with policies and procedures instituted by the DPD and the City.

154.    There are questions of law and fact common to the classes and they predominate over individualized questions. These common questions of fact and law include, but are not limited to:

   a.    Did Defendants impose curfews without accommodating, or attempting to accommodate, the right to peaceable assembly and protest?

b.      Did Defendants enforce the City's curfew in a discriminatory and unconstitutional manner, in violation of the First Amendment?

c.      Did Defendants routinely break up protests without warning and without providing directions, means, and opportunity to disperse before taking aggressive and injurious—potentially deadly—police action?

d.      Did Defendants routinely break up protests through the use of force without regard to whether the individuals against whom such force was used were engaged in conduct justifying such force?

e.      Did the City manifest a failure to adequately train and supervise its police officers and members of its mutual aid network to properly utilize tear gas, flashbang grenades, rubber bullets, and other "less-lethal" weapons?

f.      Did the City manifest a failure to provide adequate policies and procedures to its police officers and members of its mutual aid network to properly utilize tear gas, flashbang grenades, rubber bullets, and other "less-lethal" weapons?

g.      Did the City manifest a failure to adequate train and supervise its police officers and members of its mutual aid network to respect the First Amendment rights of individuals attending or participating in protests?

h.      Are there provisions omitted in the City's and DPD's policies and practices that are necessary to protect demonstrators' constitutional rights?

i. Did the City exhibit deliberate indifference to the unconstitutional conduct complained of herein?

j. Did Defendants' use of less-lethal weapons infringe upon demonstrators' constitutional rights to be free of excessive force, to peaceably assemble, and to freedom of expression, under the First Amendment?

k. Must Defendants, when imposing a curfew based on some present at a protest that is unlawful, accommodate, or attempt to accommodate, the right to peaceably assemble and protest?

l. Must Defendants, when dispersing assemblies or protests, provide adequate warning and provide both directions, means, and opportunity to disperse before taking aggressive and injurious—potentially deadly—police action?

m. Did Defendants routinely break up protests through the use of force without regard to whether the individuals against whom such force was used were engaged in conduct justifying such force violate the First, Fourth, or Fourteenth Amendments?

n. Did some or all of the conduct described above constitute a policy or custom of the City of Denver?

o. Are there classwide damages available to the various classes?

155. Defendants seized, detained, and/or arrested the putative classes as a group and treated all similarly, acting on grounds applicable to the putative class. The named Plaintiffs' claims that the First, Fourth, and Fourteenth Amendment

32

rights were violated raise common questions of law and fact. The Defendants have acted, threaten to act, and will continue to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or declaratory relief with respect to the class as a whole.

## Typicality

156.   Consistent with Federal Rule of Civil Procedure 23(a), the claims of the representative Plaintiffs are typical of the class. Plaintiffs were all present at the protests in the City of Denver; were subjected to one or more of the violations previously enumerated; and seek redress for the past violations of their rights and protection to bar the repeat of those violations in the future.

157.   Thus, Plaintiffs have the same interests and have suffered the same type of damages as the class members. Plaintiffs' claims are based upon the same or similar legal theories as the claims of the class members of each class. Each class member suffered actual damages as a result of being subjected to one or more of the violations enumerated above. The actual injuries suffered by Plaintiffs are similar in type to the actual damages suffered by each class member although the severity of those injuries may vary among class members.

158.   Consistent with Federal Rule of Civil Procedure 23(a), the representative Plaintiffs will fairly and adequately protect the interests of the class. The interests of the representative Plaintiffs are consistent with and not antagonistic to the interests of the class.

### Adequate Representation

159.    The named Plaintiffs will fairly and adequately represent the common class interest. The named Plaintiffs have a strong interest in achieving the relief requested in this Complaint, they have no conflicts with members of the Plaintiff class, and they will fairly and adequately protect the interests of the class.

160.    The named Plaintiffs are presented by counsel, Loevy & Loevy, who are well-experienced in civil rights and class action litigation and are familiar with the issues in this case. Loevy & Loevy has successfully litigated a number of class action cases, including for civil rights violations. Loevy & Loevy has tried two class actions to verdict and has successfully litigated other class action cases as class counsel. This includes *Young v. County of Cook*, Case No. 06-CV-552 (N.D. Ill.), concerning unconstitutional strip searches of inmates, and a related case against Cook County's former insurers, in which Loevy & Loevy secured $107 million in settlements after winning a trial on liability and multiple damages trials in the original case and another trial in the case against the insurance companies for improperly denying coverage. Other examples include: Loevy & Loevy obtained a $7.2 million settlement in *Flood v. Dominguez*, Case No. 08-CV-153 (N.D. Ind.), and a $16.5 million settlement in *Dunn v. City of Chicago*, No. 04-CV-6804 (N.D. Ill.), both concerning the unconstitutional treatment of inmates held in lockup.

161.    Counsel for the named Plaintiffs know of no conflicts among the between members of the class, the named Plaintiffs, or the attorneys in this action.

## Maintenance and Superiority

162.   Consistent with Federal Rule of Civil Procedure 23(b)(1)(A), prosecutions of separate actions by individual members of the classes would create a risk that inconsistent or varying adjudications with respect to individual members of the class would establish incompatible standards of conduct for the parties opposing the class.

163.   Consistent with Federal Rule of Civil Procedure 23(b)(1)(B), prosecutions of separate actions by individual members of the classes would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, substantially impair or impede the interests of the other members of the classes to protect their interests.

164.   Consistent with Federal Rule of Civil Procedure 23(b)(2), Defendants have acted on grounds generally applicable to the classes.

165.   Consistent with Federal Rule of Civil Procedure 23(b)(3), the questions of law or fact common to the members of the classes predominate over any questions affecting only individual members, and this class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties. Plaintiffs are informed and believe, and allege thereon, that the interests of class members in individually controlling the prosecution of a separate action is low in that most class members would be unable to individually prosecute any action at all. Plaintiffs are informed and believe, and thereon allege, that the amounts at stake for individuals are such that separate suits would be

impracticable in that most members of the class will not be able to find counsel to represent them. Plaintiffs are informed and believe, and thereon allege, that it is desirable to concentrate all litigation in one forum because all of the claims arise in the same location, *i.e.*, the City and County of Denver. It will promote judicial efficiency to resolve the common questions of law and fact in one forum rather than in multiple courts.

166.    Plaintiffs do not know the identities of most class members. Plaintiffs are informed and believe, and thereon allege, that the identities of the class members are ascertainable in significant part from DPD records, at least as it relates to those class members who were arrested. Plaintiffs are informed and believe, and thereon allege, that a significant number of class members may be reached by the use of outreach efforts by organizations that participated in organizing the affected protests.

167.    Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. The class action is superior to any other available means to resolve the issues. Liability can be determined on a classwide basis. General damages can also be determined on a classwide basis.

168.    Consistent with Rule 23(b)(3), class members must be furnished with the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. Plaintiffs are informed and believe that DPD computer records contain a last known address for class

members who were arrested. Plaintiffs contemplate that individual notice be given to class members at such last known address by first class mail, email and cell phone outreach, social media and efforts of organizations that organized the protests.

169.   Pursuant to Rule 23(c)(4), particular issues are appropriate for certification—namely the issues described in paragraph 154, above, because resolution of such issues would advance the disposition of the matter and the parties' interests therein.

### Damages

170.   As a direct and proximate cause of the conduct described herein, the named Plaintiffs and the class members have been denied their constitutional rights as stated herein, and have suffered damages, including but not limited to, mental and emotional distress, physical injuries and bodily harm, pain, fear, humiliation, embarrassment, discomfort, and anxiety, and other damages.

171.   Defendants' actions were done with conscious or reckless disregard for, and deliberate indifference to, Plaintiffs' and class members' rights.

172.   Plaintiffs and class members have a reasonable fear of attending protests in Denver in the future due to the cumulative effect of the violence and misconduct by the Defendants. Without intervention by this Court, the Injunctive Relief Class members, who have participated in and wish to participate or attend protest activities, particularly related to police brutality, are at risk of having their rights violated in the future due to the Defendants' demonstrated pattern of

constitutional violations and threatened future actions. The Injunctive Relief Class has no adequate remedy at law to protect the future lawful exercise of their constitutional rights, and, without action by this court, will suffer irreparable injury, thereby entitling them to injunctive and declaratory relief. The Injunctive Relief Class is represented by each of the individual class representatives.

173.    Defendants have acted and refused to act on grounds generally applicable to the putative class. Injunctive and declaratory relief for the putative class as a whole is appropriate.

174.    Defendants' policies, practices, customs, conduct, and acts alleged herein resulted in, and will continue to result in, irreparable injury to the Plaintiffs, including but not limited to violation of their constitutional and statutory rights. Plaintiffs have no plain, adequate, or complete remedy at law to address the wrongs described herein. The Plaintiffs and class members intend in the future to exercise their constitutional rights of freedom of the press, and freedom of speech and association by engaging in expressive activities in the City and County of Denver. Defendants' conduct described herein has created uncertainty among Plaintiffs with respect to their exercise now and in the future of these constitutional rights, and has chilled their exercise of these rights.

175.    Specifically, Plaintiffs are concerned that they will be subjected to unreasonable and excessive force by the DPD and/or unreasonable seizures.

176.    Plaintiffs are also concerned that, when engaged in or documenting protest activities, Defendants will impose curfews without accommodating or

38

attempting to accommodate First Amendment rights; will not provide adequate notice before attempting to disperse assemblies; will not provide adequate means and opportunity to disperse; and will again employ indiscriminate, unreasonable or excessive force, injuring and terrifying protestors.

177.    Plaintiffs therefore seek injunctive relief from this court to ensure that Plaintiffs and persons similarly situated will not suffer violations of their rights from Defendants' illegal and unconstitutional policies, customs, and practices described herein.

**The City and County of Denver's Polices, Practices, and Customs**

178.    The Defendants have engaged in repeated, widespread violations of law, as outlined above, over the course of several nights, shutting down the exercise of First Amendment activities through the use of indiscriminate and unreasonable force against thousands of protestors; imposing curfews without accommodating, or even attempting to accommodate, the right to peaceable assembly and protest; at times dispersing lawful and peaceful assemblies without warning and without providing both directions, means, and opportunity to disperse before taking aggressive police action; hitting at least hundreds of protestors with "less-lethal" weapons and/of tear gassing or pepper spraying them; selectively enforcing the curfew against protestors by arresting them for violation of an unlawful curfew and thereby placing them at great risk of exposure to COVID-19;[1] and harassing, intimidating, and/or using force on individuals attempting to record or document

---

[1] The Van Cise-Simonet Detention Center, where arrestees were taken, is the site of one of the largest COVID-19 outbreaks in the country.

police activity in public. In conjunction with a history of protest-related constitutional violations, Defendants' repeated widespread and unlawful acts over several nights and involving many locations constitute an unlawful custom and policy of violating protest participants' constitutional rights.

179.   The City failed to train its officers in the constitutional responses to peaceful demonstrations, despite the history of such violations in the past and despite the obvious need for such training. The recurrence of the same violations with respect to these protestors indicates an intentional refusal to preserve the constitutional rights of protestors.

180.   The City failed to adopt adequate policies in the constitutional responses to peaceful demonstrations, despite the history of such violations in the past and despite the obvious need for adequate policies. The recurrence of the same violations with respect to these protestors indicates an intentional refusal to preserve the constitutional rights of protestors.

181.   For instance, the DPD and City have been called on numerous times dating back at least to 2011 to investigate the use of pepper balls against protestors.

182.   After Denver police fired pepper balls at peaceful protestors on October 29th, 2011 during the Occupy Denver demonstrations in Civic Center Park, the City received several complaints and conducted an internal debriefing. The City and DPD concluded no further review of the department's less-than-lethal force policy was merited, despite the patently unlawful way in which pepper ball guns had been used against protestors and against the recommendation of the Office of the

Independent Monitor, which described the decision not to examine the incident and the underlying policies as a "missed opportunity."

183.    The City's policy, practice, and custom of authorizing officers to use "less-lethal" weapons to control and suppress protests was the moving force behind the violations of Plaintiffs' and class members' constitutional rights. These violations are also a direct result of the City's use of the services of law enforcement officers from other jurisdictions, who were also authorized to use "less-lethal" weapons to control and suppress protests.

184.    The City and its final policymakers have acted with deliberate indifference to the constitutional rights of protestors by authorizing, both explicitly and implicitly, the use of "less-lethal" force against protestors who do not pose any safety threat; by failing to properly train, supervise, and discipline officers regarding the proper use of force against protestors; by failing to rectify the unconstitutional custom of officers using "less-lethal" force to control and suppress demonstrations; and by failing to provide adequate policies. This constituted a conscious choice by the City not to properly train, supervise, discipline, rectify, or provide adequate policies on these issues.

185.    Moreover, the City is responsible for the actions of any non-DPD officers whose services were used during the protests. By using those services, the City was required to ensure that all officers complied with protestors' constitutional rights.

186.    DPD Chief of Police Paul Pazen was fully knowledgeable and apprised of the actions of Defendant Officers described above and, upon information and belief, was on site on one or more days of the protest, observing this DPD operation, without repudiating or stopping the actions of the Defendant Officers, thereby ratifying them.

187.    Moreover, on the morning of May 29, 2020, Mayor Michael Hancock and Chief Pazen publicly praised Defendant Officers for their "great restraint" and "tremendous restraint" during protests in Denver and said that the actions of the DPD in the use of "less-lethal" weapons against protestors was proper. Thus, the City ratified the conduct of the Defendant Officers. The violence and misconduct by Defendant Officers continued that day and in the days after the Mayor and the Chief of Police made these comments.

188.    The City's final policymakers have received ample notice that officers were using "less-lethal" force against protestors to control and suppress demonstrations in the absence of any imminent threat to safety, including 150 complaints about the DPD in one 72-hour period, and widely publicized videos and firsthand accounts circulated through the local, state, and international press.

189.    Furthermore, the City's curfew described above was an official policy of the City which was unconstitutional under the First Amendment, and enforced in a unconstitutional manner in violation of the First and Fourteenth Amendments.

190.   The violations of the constitutional rights of the Plaintiffs who were arrested and the Arrest Class members were a direct result of the City's official, unconstitutional policy.

### Count I: 42 U.S.C. § 1983 – First Amendment

191.   Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

192.   Plaintiffs allege that the Defendants violated their and class members' rights under the First Amendment of the United States Constitution, in the ways that follow:

193.   In the manner described more fully above, the Defendant City's curfew was unconstitutionally applied to protestors. The City had adopted an official policy of arresting only protestors during the curfew hours and not non-protestors. This was designed to further suppress Plaintiffs' and the Arrest Class members' protected First Amendment activities including the right to free speech, expression, and assembly, and it violated the First Amendment.

194.   The Defendant City's curfew also violated the First Amendment in that it provided no exceptions for First Amendment-protected activity.

195.   In the manner described more fully above, Defendants violated Plaintiffs' and the Direct Force Class members' First Amendment rights when they attempted to control and break up the peaceful protests by using "less-lethal" weapons on and/or kettling the Plaintiffs and class members without warning, dispersal orders, adequate time to disperse, or any lawful justification whatsoever.

These actions were undertaken in order to discourage and suppress the exercise of Plaintiffs' and class members' First Amendment rights.

196.   Furthermore, the right to gather, receive, record, and disseminate information is grounded in the Free Speech Clause of the First Amendment, as well as the Petition Clause, if the purpose of gathering, receiving, or recording the information is to use it to petition the government for redress of grievances, and the Free Press Clause, if the purpose of gathering, receiving, or recording the information is to publish and disseminate it to other people.

197.   The First Amendment right to gather, receive, record, document, and disseminate information includes the right to photograph, audio and video record police officers performing their duties in public, as well as the right to photograph, audio and video record demonstrations.

198.   Police officers performing their public duties in public places have no reasonable expectation that their conduct is private and will not be recorded, documented, published, and disseminated.

199.   Defendants' actions in using "less-lethal" weapons on individuals recording or documenting police officers performing their public duties in public places violated the First Amendment rights of Plaintiffs and the Direct Force Class members.

200.   Defendants' actions in using "less-lethal" weapons on protestors in order to control and suppress their speech violated the First Amendment rights of Plaintiffs and the Direct Force Class members.

201.   The misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of the Defendant City. The policies, practices, and customs of the Defendant City were the moving force behind the misconduct described in this Count and the violation of Plaintiffs' and class members' rights.

202.   The Defendant City is liable because the violation of Plaintiffs' and class members' rights as described in this Count was caused by the policies, practices, or customs of the relevant policymakers for the City.

203.   In the manner described more fully above, the need for policies, training, and supervision of officers on how to handle the use of force on protestors was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the Defendant City can reasonably be said to have been deliberately indifferent to the need.

204.   As a direct and proximate result of Defendants' actions, Plaintiffs' and class members' constitutional rights were violated, entitling them to declaratory relief. Plaintiffs and class members are also entitled to injunctive relief and damages, as described herein.

## Count II: 42 U.S.C. § 1983 -- Fourth Amendment

205.   Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

206.   In the manner described more fully above, Defendants violated Plaintiffs' and class members' rights to be free from excessive force and unreasonable seizure when they used "less-lethal" weapons, kettled, and/or arrested Plaintiffs and Direct Force Class members without any lawful justification.

45

207.   Defendants used unreasonable and excessive force in indiscriminately shooting "less-lethal" weapons at protestors, or specifically to suppress their expressive activity, and not based on an individualized determination of individual conduct justifying such force, in violation of the Fourth Amendment.

208.   The misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of the Defendant City. The policies, practices, and customs of the Defendant City were the moving force behind the misconduct described in this Count and the violation of Plaintiffs' and class members' rights.

209.   The Defendant City is liable because the violation of Plaintiffs' and class members' rights as described in this Count was caused by the policies, practices, or customs of the relevant policymakers for the City.

210.   In the manner described more fully above, the need for policies, training, and supervision of officers on how to handle the use of force on protestors was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the Defendant City can reasonably be said to have been deliberately indifferent to the need.

211.   As a direct and proximate result of Defendants' actions, Plaintiffs' and class members' constitutional rights were violated, entitling them to declaratory relief. Plaintiffs and class members are also entitled to injunctive relief and damages, as described herein.

## Count III: 42 U.S.C. § 1983 -- Fourteenth Amendment
## Due Process and Equal Protection

212.   Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

213.   In the manner described more fully above, Defendants violated Plaintiffs' and the Direct Force Class members' rights to due process when they affirmatively and indiscriminately used "less-lethal" weapons and/or kettled Plaintiffs and class members without any lawful justification. Furthermore, this conduct was deliberately different to the Direct Force Class members' rights, shocks the conscience, and violated the decencies of civilized conduct, under the Fourteenth Amendment.

214.   In the manner described more fully above, Defendants violated Plaintiffs' and Arrest Class members' rights to due process and equal protection when they arrested them for violation of the curfew.

215.   The misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of the Defendant City. The policies, practices, and customs of the Defendant City were the moving force behind the misconduct described in this Count and the violation of Plaintiffs' and class members' rights.

216.   The Defendant City is liable because the violation of Plaintiffs' and class members' rights as described in this Count was caused by the policies, practices, or customs of the relevant policymakers for the City.

217.   In the manner described more fully above, the need for policies, training, and supervision of officers on how to handle the use of force on protestors

was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the Defendant City can reasonably be said to have been deliberately indifferent to the need.

218.   As a direct and proximate result of Defendants' actions, Plaintiffs' and class members' constitutional rights were violated, entitling them to declaratory relief. Plaintiffs and class members are also entitled to injunctive relief and damages, as described herein.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs seek judgment as follows:

219.   An order certifying each class defined herein pursuant to the Federal Rules of Civil Procedure 23(b)(2) and (3);

220.   An order appointing the named Plaintiffs as class representatives and their undersigned counsel as class counsel;

221.   A preliminary and permanent injunction restraining Defendants from engaging in the unlawful and unconstitutional actions detailed above and retaining court jurisdiction to enforce the terms of the injunction;

222.   A declaratory judgment that Defendants' conduct detailed herein was a violation of the rights of the Plaintiffs and class members under the United States Constitution;

223.   General and compensatory damages for Plaintiffs and the class they represent for the violations of their federal constitutional rights, pain and suffering;

224.   Punitive damages for Plaintiffs based on the actions of individual Defendants Does 1-10;

225.   An award of attorneys' fees pursuant to 42 U.S.C. § 1988, and costs;

226.   Pre- and post-judgment interest as permitted by law;

227.   Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(c) on all issues so triable.

Respectfully submitted,

/s/ Elizabeth Wang
Elizabeth Wang
Daniel M. Twetten
LOEVY & LOEVY
2060 Broadway, Suite 460
Boulder, CO 80302
O: 720.328.5642
elizabethw@loevy.com
dan@loevy.com
*Counsel for Plaintiffs*