IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-CV-1922-DDD

AMBROSE CRUZ,
SARA FITOURI,
JACQUELYN PARKINS,
YOUSSEF AMGHAR,
ANDY SANNIER,
FRANCESCA LAWRENCE,
KELSEY TAYLOR,
JOE DERAS,
JOHNATHEN DURAN,
individually and on behalf of a class of similarly situated persons,

      Plaintiffs

v.

CITY AND COUNTY OF DENVER, COLORADO,
OFFICER JACQUELINE A. VELASQUEZ, #16021,
OFFICER M. DAVIS, # 13058,
OFFICER ANDREW NIELSEN, # 14076,
OFFICER ZACHARY MOLDENHAUER, # 17013,
OFFICER JACOB VAPORIS, # 16003,
OFFICER KEVIN BEASLEY, # 13066,
OFFICER CHELSEA NOVOTNY, # 14030,
OFFICER CHRISTOPHER COCHRAN, # 17081,
OFFICER PAUL HOGAN, # 98042,
OFFICER HEATHER R. JOSSI, # 07059,
OFFICER ANTHONY E. TAK, # 00018,
OFFICER J. LNU, # 91029,
DOES 1-10,

      Defendants.

---

## FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

Now come Plaintiffs, Ambrose Cruz, Sara Fitouri, Jacquelyn Parkins, Youssef Amghar, Andy Sannier, Francesca Lawrence, Kelsey Taylor, Joe Deras, and Johnathen Duran, through their attorneys, LOEVY & LOEVY, and hereby complains of Defendants City and County of Denver, Colorado, Officer Jacqueline A. Velasquez, # 16021, Officer M. Davis, # 13058, Officer Andrew Nielsen, # 14076, Officer Zachary Moldenhauer, # 17013, Officer Jacob Vaporis, # 16003, Officer Kevin Beasley, # 13066, Officer Chelsea Novotny, # 14030, Officer Christopher Cochran, # 17081, Officer Paul Hogan, # 98042, Officer Heather R. Jossi, # 07059, Officer Anthony E. Tak, # 00018, Officer J. LNU, # 91029, and Does 1-10, as follows:

## INTRODUCTION

1.      This action arises out of protests in Denver and across the nation following the murder of George Floyd on May 25, 2020, by Minneapolis police officers. The events in Minneapolis brought out millions of people around the country at once to peacefully protest the deaths of Black and Brown people by law enforcement and vigilantes condoned by local law enforcement as well as the systemic racism that oppresses Black, Indigenous, and people of color. Despite the COVID-19 pandemic, thousands of people came out to demonstrate in Denver and elsewhere in Colorado.

2.      Although the protests were overwhelmingly peaceful, the Denver Police Department ("DPD") and officers from other agencies in DPD's mutual-aid network (collectively, "Defendant Officers") used violent crowd control tactics against these peaceful protestors. Over the course of several days, the Defendant

Officers deployed constitutionally unlawful crowd control tactics, including kettling, indiscriminate and unwarned launching of tear gas and flashbangs into crowds and at individuals, and shooting projectiles at protestors. These protestors included many young Black and Brown people.

3. Defendant Officers knowingly placed these protestors in physical danger through indiscriminate use of excessive force.

4. Defendant Officers intentionally used force on peaceful protestors with no lawful justification.

5. Not only did this excessive use of force injure many protestors, journalists, and bystanders, but it chilled individuals from exercising their First Amendment rights and suppressed speech.

6. Defendant Officers targeted journalists and others simply documenting their conduct. They targeted medics who were seeking to give aid to those harmed.

7. Although the protests were overwhelmingly peaceful, the DPD arrested over 350 people over the course of several days beginning on May 28, 2020, the first day of the protests in Denver.

8. For numerous days beginning on May 28, 2020, Defendants used methods of "less-lethal" force to discourage and suppress peaceful protest in public places (including streets, sidewalks, and parks) in Denver, particularly in the downtown area.

9.     The actions of the Defendant Officers and the Defendant City infringed on the rights of protestors, journalists, and bystanders to be free from unreasonable seizures and use of force under the Fourth and Fourteenth Amendments.

10.     The purpose and effect of this excessive use of force was to prevent, deter, and suppress protestors from exercising their First Amendment right to exercise freedom of speech, peaceably assemble, and petition for redress of grievances.

11.     In addition, the Defendant City imposed a citywide nighttime curfew from May 30 through June 4, 2020 and arrested protestors for violating this curfew. These actions violated protestors' rights under the First, Fourth, and Fourteenth Amendments.

12.     Plaintiffs bring this action seeking to restrain the Defendant City of Denver and DPD from further violence and unconstitutional conduct and seeking damages on behalf of themselves individually and others similarly situated to them.

## Jurisdiction

13.     This court has jurisdiction of this action pursuant to 28 U.S.C. § 1331.

14.     Venue is proper under 28 U.S.C. 1391(b). All parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred in this judicial district.

## The Parties

15.     Plaintiff Ambrose Cruz is a freelance journalist and photographer and a resident of Denver, Colorado.

16.     Plaintiff Sara Fitouri is a lawyer and resident of Denver, Colorado.

17.     Plaintiff Jacquelyn Parkins is a union organizer and resident of Denver, Colorado.

18.     Plaintiff Andy Sannier is a software engineer and resident of Denver, Colorado.

19.     Plaintiff Francesca Lawrence works with youth in the juvenile justice system and is a resident of Denver, Colorado.

20.     Plaintiff Kelsey Taylor is a small business owner and a resident of Denver, Colorado.

21.     Plaintiff Youssef Amghar is a former U.S. Marine and resident of Denver, Colorado.

22.     Plaintiff Joe Deras is a union organizer and a resident of Denver, Colorado.

23.     Plaintiff Johnathen "De La Vaca" Duran (henceforth referred to as "De La Vaca"), is a journalist and magazine editor at Yellow Scene magazine. He is a resident of Boulder County, Colorado.

24.     Defendant City and County of Denver (the "City") is a Colorado municipal corporation. The DPD is an agency of the Defendant City, and all actions of the DPD are the legal responsibility of the City. The City is sued on the basis of its policies, customs, and practices which gave rise to Plaintiffs' federal rights claims.

25.     Defendant Officer Jacqueline A. Velasquez, # 16021, is or was at all relevant times an employee of the DPD and acting within the scope of their

employment and under the color of law. Defendant Velasquez is sued in their individual capacity.

26.     Defendant Officer Andrew Nielsen, # 14076, is or was at all relevant times an employee of the DPD and acting within the scope of their employment and under the color of law. Defendant Nielsen is sued in their individual capacity.

27.     Defendant Officer M. Davis, # 13058, is or was at all relevant times an employee of the DPD and acting within the scope of their employment and under the color of law. Defendant Davis is sued in their individual capacity.

28.     Defendant Officer Zachary Moldenhauer, # 17013, is or was at all relevant times an employee of the DPD and acting within the scope of their employment and under the color of law. Defendant Moldenhauer is sued in their individual capacity.

29.     Defendant Officer Jacob Vaporis, # 16003, is or was at all relevant times an employee of the DPD and acting within the scope of their employment and under the color of law. Defendant Vaporis is sued in their individual capacity.

30.     Defendant Officer Kevin Beasley, # 13066, is or was at all relevant times an employee of the DPD and acting within the scope of their employment and under the color of law. Defendant Beasley is sued in their individual capacity.

31.     Defendant Officer Chelsea Novotny, # 14030, is or was at all relevant times an employee of the DPD and acting within the scope of their employment and under the color of law. Defendant Novotny is sued in their individual capacity.

32.     Defendant Officer Christopher Cochran, # 17081, is or was at all relevant times an employee of the DPD and acting within the scope of their employment and under the color of law. Defendant Cochran is sued in their individual capacity.

33.     Defendant Officer Paul Hogan, # 98042, is or was at all relevant times an employee of the DPD and acting within the scope of his employment and under the color of law. Defendant Hogan is sued in his individual capacity.

34.     Defendant Officer Heather R. Jossi, # 07059, is or was at all relevant times an employee of the DPD and acting within the scope of her employment and under color of law. Defendant Jossi is sued in her individual capacity.

35.     Defendant Officer Anthony E. Tak, # 00018, is or was at all relevant times an employee of the DPD and acting within the scope of his employment and under color of law. Defendant Tak is sued in his individual capacity.

36.     Defendant Officer J. LNU (Last Name Unknown), # 91029, is or was at all relevant times an employee of the DPD and acting with the scope of their employment and under the color of law. Defendant LNU is sued in their individual capacity.

37.     At all material times herein, the City was responsible for supervising, enacting, and enforcing the DPD's conduct, policies, and practices; the absence of necessary policies and practices; and for the hiring, retention, supervision, and training of employees and agents of the DPD.

38.   The Defendant City requested the assistance of other law enforcement agencies in responding to the protests, pursuant to mutual-aid agreements.

39.   A DPD supervisor was embedded with each team of outside officers from the DPD's mutual-aid network.

40.   The DPD reviewed its "rules of engagement" with the outside officers from its mutual-aid network before allowing them to provide assistance to the DPD.

41.   Thus, the City was also responsible for the actions of the members of its mutual-aid network.

42.   Plaintiffs are informed, believe, and thereupon allege that Does 1 through 10 were the agents, servants, and/or employees of the DPD or officers of other jurisdictions who were acting with the authorization of the DPD. Plaintiffs are ignorant of the true names of these Doe Defendants and therefore sue these Defendants by such fictitious names. Plaintiffs will amend this Complaint to allege their true names when ascertained. The individual Doe Defendants are sued in their individual capacities.

43.   The individual Defendant Officers, named and unnamed, are henceforth referred to as the "Defendant Officers."

44.   At all times relevant hereto, Does 1 through 10, in addition to the named Defendants, are responsible in for the damages and injuries alleged herein.

45.   At all times relevant hereto, Defendant Officers were the agents, servants, and/or employees of the Defendant City and were acting at all times under

color of law and within the scope of their agency or employment and with the knowledge and consent of their principal or employer.

46.     The acts and omissions of all Defendant Officers were at all material times pursuant to the customs, policies, practices, and/or procedures of the Defendant City and DPD.

## Factual Background

47.     On Monday, May 25, 2020, a Minneapolis police officer brutally murdered George Floyd, an unarmed and non-resisting Black man, while other police stood by and watched.

48.     Innumerable people held peaceful protests across the world condemning police brutality and systemic racism in the wake of the state sponsored and/or sanctioned/excused murders of George Floyd, Breonna Taylor, Ahmaud Arbery, Elijah McClain, Tony McDade, and countless others.

49.     These constitutionally protected and essential protests occurred amid an unprecedented public health crisis. Novel coronavirus, COVID-19, has killed over 135,000 Americans, infected more than 3.3 million Americans, and continues to spread. The virus is commonly understood to be transmittable through exposure to respiratory droplets. Public health and government officials, including in Denver, have advised people to wear masks if they were outside and to stay six feet apart.

50.     At or around 5:00 p.m. on May 28, 2020, protestors gathered at the Colorado State Capitol in downtown Denver to protest police brutality and racism

against Black people in the United States. Protestors carried signs, chanted, and knelt. Hundreds of protestors were present.

51.    Thousands of protestors assembled to demonstrate in Denver every day for many days.

52.    Protestors frequently assembled at the Colorado State Capitol building, but they also marched down streets, primarily in the downtown Denver area.

53.    During the protests, the Defendants employed violent crowd control tactics to corral, intimidate, and suppress the speech of protestors.

54.    Defendant Officers used a variety of "less-lethal" weapons, including tear gas, flashbang grenades, pepper balls, rubber bullets, and other projectiles fired directly at protestors.

55.    Defendant Officers used these tactics on protestors who were demonstrating peacefully, without first issuing warnings, lawful (or any) orders, or giving them adequate time to disperse.

56.    Tear gas is a general term for aerosolized chemical agents. Tear gas generally includes CS (o-chlorobenzylidene malonitrile) and OC (oleoresin capsicum).

57.    Tear gas activates pain receptors and leads to intense burning pain in the eyes, throat, lungs, skin and mucus membranes. It also causes disorientation, severe coughing, crying, and difficulty breathing.

58.     Defendant Officers also used kinetic impact projectiles ("KIPs") during the protests on peaceful protestors.

59.     KIPs refers to a range of projectiles used in crowd control settings that are made from combinations of rubber, plastic, PVC, various metals, wood, hard foam, and wax, which are often generically referred to as "rubber bullets." These include foam batons and rubber pellets. (The term "rubber bullet" used henceforth has the meaning provided in this paragraph.)

60.     The DPD uses 40mm launchers to shoot KIPs as well as flashbang grenades.

61.     The 40mm launchers shoot projectiles at a speed of 90 to 100 miles per hour.

62.     KIPs frequently cause contusions or welts.

63.     When shot at close range, KIPs can cause serious bodily injury or death.

64.     When shot from farther range, KIPs have reduced accuracy.

65.     In addition, the use of riot control face gear makes the targeting of these weapons even more difficult.

66.     Defendant Officers consistently wore riot gear while present during the protests in Denver beginning on May 28, 2020.

67.     Pepper ball guns are air-powered launch devices that fire rounds containing plastic sphere projectiles filled with OC powder. These spheres explode OC powder onto the person who gets hit, causing the person to struggle to breathe.

68.     Pepper balls and pepper spray have an immediate and incapacitating effect that creates a burning sensation to any exposed skin.

69.     Flashbang grenades are explosives that make a loud noise and/or flash of light, and are made to temporarily blind and/or deafen people and disorient them.

70.     Flashbang grenades can cause serious bodily injury, including damage to hearing, burns, or even death.

71.     Over the course of several days, beginning on May 28, 2020, Defendant Officers shot tear gas, pepper balls, flashbang grenades, and KIPs at groups of largely peaceful protestors near the Capitol and in the downtown Denver area.

72.     Defendant Officers used these weapons indiscriminately and without warning, even at times when the crowd was merely chanting, kneeling or standing with their hands up.

73.     Many people were hit with projectiles and thousands inhaled tear gas or suffered pain and burning in their eyes, nose, mouth and throat from pepper balls and tear gas used by the officers.

74.     Defendant Officers also used "kettling" as a tactic against the protestors. Kettling, which derives from a German military term referring to an army surrounded by a much larger force, is a police tactic whereby officers confine a large group of people to a designated space by surrounding them on all sides so that there is no escape. By doing so, the officers effectively control people's movements.

75.     Kettling leads to the unlawful seizure of people without a reasonable basis, creates panic, elevates tensions, and chills speech. Defendant Officers

accomplished this by forming police lines around protestors. They also kettled protestors before using "less-lethal weapons" on them such as tear gassing, pepper spraying, flashbanging, and shooting rubber bullets at them.

76.     One tactic used by Defendant Officers during the protests was to chase nonviolent protestors into and trap them in alleys and then shoot chemical weapons such as tear gas or pepper spray at them, and/or flashbang grenades.

77.     On Friday, May 29, 2020, peaceful protestors again gathered at the Capitol. Defendant Officers near the protest site at the Capitol wore riot gear. Protestors chanted, "Why are you in riot gear, I don't see no riot here." Without provocation or warning, Defendant Officers fired "less-lethal" weapons into the crowd of protestors.

78.     Throughout the hours that followed, Defendant Officers continued to engage in other violent and intimidating tactics, including shooting protestors who were kneeling and chanting with their hands up.

79.     Defendant Officers also used "less-lethal" weapons on members of the press as well as individuals recording or photographing their activities.

80.     On Saturday, May 30, 2020, peaceful protestors assembled at the Capitol in the afternoon. In response and over the next several hours, Defendant Officers intimidated protestors with "less-lethal" weapons.

81.     Some Defendant Officers fired projectiles or pepper balls or pepper spray directly at protestors' heads and faces.

82.     Other Defendant Officers fired at protestors while hanging off of the side or back of moving police vans or trucks.

83.     Defendant Officers also shot "less-lethal" weapons at protestors peacefully kneeling on the ground and chanting.

84.     On May 30, 2020, at around 1:00 p.m., the Mayor of Denver declared an "emergency" and announced a curfew order for the entire city, set to begin at 8:00 p.m. that evening.

85.     The City did not have sufficient justification under the law to declare a "state of local emergency" and issue a citywide "emergency" curfew order.

86.     The curfew was issued while thousands of individuals peacefully marched and demonstrated in Denver.

87.     The curfew was imposed in all public places within the City and County of Denver, including streets and public rights-of-way, from 8:00 p.m. on May 30, 2020 to 5:00 a.m. on Sunday, May 31, 2020, and from 8:00 p.m. on May 31, 2020 until 5:00 a.m. on June 1, 2020.

88.     On June 1, 2020, the Mayor of Denver extended the curfew for four more days. The curfew was in effect each night from 9:00 p.m. to 5:00 a.m. on the evenings of June 1, 2, 3, and 4, 2020.

89.     During the curfew hours, "all persons" were "prohibited from using, standing, sitting, traveling or being present on any public street or in any public place, including for the purpose of travel," with certain exceptions, including

"credentialed members of the news media." However, there was no exception for First Amendment activity.

90.     A violation of the curfew order was a criminal violation punishable by a fine up to $999.00 or imprisonment up to 300 days.

## Factual Allegations Relating to Plaintiffs

## Plaintiffs Sara Fitouri, Jacquelyn Parkins, and Joe Deras

91.     Plaintiffs Sara Fitouri and Jacquelyn Parkins participated in the protests every day beginning on May 28, 2020 for numerous days. Plaintiff Joe Deras participated in the protests from May 28 through May 31, 2020. They attended to protest police brutality against Black and Brown people.

### *May 28, 2020*

92.     On or around 5:00 p.m. on May 28, 2020, Parkins went to the Capitol building and participated in the protests. When some of the protestors began marching north, Fitouri joined Parkins as Parkins marched with them. The protest was peaceful.

93.     Fitouri, Parkins, and Deras marched through Confluence Park toward I-25 with the rest of the marchers. On or around 7:00 p.m., they observed Doe Defendant DPD Officers fire dozens of pepper balls and/or tear gas on the group of protestors on the highway. At that time, Fitouri, Parkins, and Deras were on a pedestrian walkway over I-25. They inhaled tear gas and/or pepper balls fired by the Doe Defendant DPD Officers while on the walkway. When Plaintiffs rejoined the march heading back downtown, they inhaled tear gas and/or pepper spray that Doe Defendant DPD Officers had used on protestors in that area.

15

*May 29, 2020*

94.     In the afternoon on May 29, 2020, Fitouri, Parkins, and Deras arrived at or near the Capitol to join the protest and march. They marched with the other protestors, who were peaceful. The march went to several locations, including the City and County Building and the jail.

95.     At approximately 8:00 p.m., Fitouri and Parkins and other protestors were at the intersection of Colfax and Broadway. The group was peaceful. Someone in the group may have lofted a water bottle into the air. Rather than investigate and isolate that person, Doe Defendant Officers indiscriminately opened fire with tear gas and pepper balls at the entire group of protestors, including Fitouri and Parkins, without warning or order to disperse.

96.     Once the initial pepper spray rounds were fired, the Doe Defendant Officers continued to use pepper balls, tear gas, and flashbang grenades on the protestors, including Fitouri and Parkins, from the corner of Broadway and Colfax, as well as multiple other locations on and around the Capitol.

97.     At one point, the Doe Defendant Officers used pepper balls, tear gas, and flashbang grenades to push protestors southeast of the Capitol into the surrounding neighborhoods. Fitouri and Parkins, along with another group of protestors, inhaled significant amounts of pepper spray and tear gas during this offensive move.

98.     Fitouri and Parkins saw many injured protestors at this time, including one woman who was unable to see or breathe and was caught in the gas.

99. The Doe Defendant Officers did not close any of the streets and their actions pushed protestors into active oncoming traffic.

100. Fitouri and Parkins left the protest on or around 10:30 p.m., after experiencing significant exposure to tear gas fired by Doe Defendant Officers very close to their persons. Doe Defendant Officers used pepper balls, tear gas, and flashbang grenades on protestors consistently throughout the evening and were still using pepper balls, tear gas, and flashbang grenades at the time Fitouri and Parkins left.

101. The Doe Defendant Officers used pepper balls, tear gas, and flashbang grenades across Colfax while the street was filled with traffic waiting at the red light. Many cars had pepper balls, tear gas, and flashbang grenades hit their cars or the ground immediately next to the cars.

102. On the evening of May 29, 2020, Fitouri and Parkins also observed that Doe Defendant Officers indiscriminately shot tear gas and/or pepper balls at the entire group of protestors any time protestors moved within approximately 15 feet of the Officers.

103. The Doe Defendant Officers never gave any warnings or dispersal orders before shooting tear gas and/or pepper balls at protestors.

104. Doe Defendant Officers shot tear gas and/or pepper balls at peaceful protestors who were kneeling on many occasions. Many of these protestors had their hands in the air and their shirts off.

105. At many points in the evening of May 29, 2020, when Fitouri and Parkins and other peaceful protestors were on the Capitol steps with their hands up, chanting "Hands up, don't shoot," Doe Defendant Officers fired flashbang grenades, tear gas, and pepper balls into the crowd indiscriminately and without warning or orders.

*May 30, 2020*

106. On the evening of May 30, 2020, Parkins saw Doe Defendant Officers hanging off the sides of police trucks and shooting at protestors as fast as they could.

107. On or around 4:00 p.m., Fitouri and Parkins arrived at the Capitol building for the evening protests prior to the start of curfew. They began at the west steps of the Capitol building.

108. Before curfew that day, a Doe Defendant Officer on Colfax north of the protestors threw a flashbang grenade into the crowd, which exploded at Fitouri's foot. Fitouri's foot went numb and she suffered minor burns. The flashbang grenade also exploded near Deras, injuring his eardrum and causing sharp pain in his ear for several days afterwards.

109. While peacefully protesting with other peaceful protestors before curfew, Doe Defendant Officers shot at Deras with pepper balls and another kind of KIP. The officers also used tear gas and smoke on Deras and other protestors, and Deras was caught in the smoke and tear gas multiple times in the early evening.

110.    Deras saw Doe Defendant Officers routinely shoot tear gas at the protestors on Lincoln near the Capitol periodically, for no apparent reason. Deras did not once hear any warnings or orders (including dispersal orders) given by the police.

111.    Parkins and Fitouri saw Doe Defendant Officers shoot tear gas, flashbang grenades, and/or pepper spray into the crowd of protestors without warning or dispersal orders. Deras was very badly gassed, as described below.

112.    At about 7:00 p.m., Doe Defendant Officers shot multiple canisters of tear gas onto the Capitol lawn. Deras was close to the steps of the Capitol at this time, near Lincoln. He did not see the tear gas coming until his breathing was adversely affected. Deras ran towards the south side of the Capitol, towards Sherman and 14th Avenue. Deras almost lost consciousness because he could not catch his breath, his vision was blurred, his face was on fire, and he was very disoriented. Another person saw Deras struggling and was able to put milk and magnesia on his face. Deras struggled to breathe for approximately half an hour.

113.    All of this occurred before curfew on March 30, 2020.

114.    There was no warning about enforcement of the curfew before the curfew. Instead, at 8:00 p.m., Doe Defendant Officers came out of the Capitol building and launched tear gas, flashbang grenades, and/or pepper spray at the protestors, including Fitouri, Parkins, and Deras, indiscriminately and without warning or dispersal orders.

115.    Fitouri, Parkins, and Deras then marched with a group of protestors. Southeast of the Capitol, Doe Defendant Officers began shooting pepper balls at the protestors without warning or giving any dispersal or other orders. Fitouri, Parkins, and Deras were with a group of approximately 30 people who ran into an alley in order to avoid being hit. Doe Defendant Officers chased the protestors both on foot and on SWAT vehicles into the alley in order to trap them and continue shooting at them. Fitouri was hit with pepper balls.

116.    Deras recalls Doe Defendant Officers throwing tear gas and flashbang grenades at him and other protestors trapped in an alley. This was very traumatic to Deras and others because people were scared, trying to run away, and some people were getting trampled.

117.    Eventually, Plaintiffs were able to get to their cars to leave.

118.    At the time that Fitouri and Parkins were present in public places in Denver after curfew on May 30, 2020, the Doe Defendant Officers "enforced" the curfew against them and other protestors by shooting pepper balls or throwing tear gas at them and/or chasing them into alleys in order to use "less-lethal" weapons on them.

119.    The Doe Defendant Officers did not give any warnings or dispersal orders and appeared only interested in intimidating and punishing protestors with their "less-lethal" weapons.

120.    Fitouri, Parkins, and Deras saw many non-protestors present in public places in Denver after curfew on May 30, 2020 and/or May 31, 2020 who were

ignored by the Doe Defendant Officers and were not shot at, tear gassed, pepper sprayed, or arrested.

121.   After they left the protest, Fitouri, Parkins, and Deras returned to their place of work at 15th Avenue and Grant Street where their cars were parked, in order to go home. Plaintiff Youssef Amghar was with them. They were standing in a private parking lot of their workplace. A group of protestors came by. Suddenly, one or more police vehicles screeched to a halt, many Doe Defendant Officers got out of their vehicles and began shooting pepper balls and/or tear gas at the protestors without warning or dispersal orders. Plaintiffs attempted to hide behind their own vehicles. The officers shot at them and other protestors running through the parking lot from approximately 20 feet away.

*May 31, 2020*

122.   On Sunday, May 31, 2020, in the early evening, Fitouri, Parkins, and Youssef met at the Capitol to join the protest, which was peaceful. They marched with the other protestors.

123.   After the 8:00 p.m. curfew, when Fitouri, Parkins, Deras, Plaintiff Youssef Amghar, and other protestors marched near the police precinct on Washington and Colfax, Doe Defendant Officers intentionally allowed half the group to pass and then began tear gassing, flashbanging, and pepper spraying the middle of the protest march. There were likely several thousand protestors in the march at this time.

124.    Plaintiffs did not witness protestors do anything violent or that would otherwise justify the force used by the Doe Defendant Officers.

125.    The Doe Defendant Officers gave no warnings or orders prior to their use of force.

126.    Deras was hit three times with tear gas canisters shot by Doe Defendant Officers, once in his head, once in his hand, and once in his back.

127.    Deras was seriously injured and immediately left to seek treatment at a nearby hospital. Deras's hand became severely swollen and felt like it was broken. He could not bend his thumb or move his hand. In the weeks that followed, it was difficult to do normal things such as writing, typing, and cooking. Deras also had pain in his back, which made it difficult to sleep, and also made it difficult to stand or sit for very long.

128.    The serious injury inflicted on Deras by Doe Defendant Officers suppressed and cut short his ability to exercise his First Amendment rights, not only on that day but on several days afterwards.

129.    Deras feared the weapons and excessive force that the Doe Defendant Officers were using and did not return to the protests for several days as a result.

130.    At one point on that evening, Fitouri and Parkins were at the Basilica near 15th Avenue and Grant Street with at least 100 other protestors. Doe Defendant Officers kettled the protestors. Indiscriminately and without warning or orders, the officers shot tear gas, flashbang grenades, and pepper balls into the crowd from every direction. It was difficult for protestors to escape.

131.    There was no lawful justification for the Doe Defendant Officers' use of force described in the preceding paragraphs.

132.    On days when they attended protests in Denver and during the events described above, Fitouri, Parkins, and Deras experienced tear gas and/or pepper spray on numerous occasions, as described above, which caused coughing, difficulty breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the skin.

### Plaintiff Andy Sannier

133.    Plaintiff Andy Sannier participated in the protests from May 28, 2020 to June 7, 2020. He attended to protest police brutality against Black and Brown people, provide eyewash, food and water to protestors, and to be a witness.

### *May 28, 2020*

134.    On May 28, 2020, Sannier joined the protests at around 5:00 or 6:00 p.m. He marched with other peaceful protestors near the Capitol and on streets downtown. They marched to I-25, but Sannier did not get on I-25. He saw Doe Defendant Officers tear gassing people on I-25, and bystanders who were on the pedestrian bridge were exposed to massive doses of tear gas and/or pepper spray.

135.    Within two hours of joining the protests on that first day, Sannier had been pepper sprayed for no lawful reason.

### *May 29, 2020*

136.    On May 29, 2020, Sannier protested with other peaceful demonstrators in downtown Denver. At one point, there were lines of Doe Defendant Officers facing protestors, who were yelling at them, but who were peaceful. The officers

repeatedly deployed tear gas on the protestors at no provocation and without warning. The chant that most often preceded a tear gassing was "Why are you in riot gear? I don't see no riot here."

137.    When Sannier was walking home downtown that evening, he saw a Black man yelling at (but not threatening) Doe Defendant Officers. A white couple started arguing with the Black man who was yelling at the Doe Defendant Officers. Sannier recorded this with his cell phone from a comfortable distance. The officers opened fire on the people arguing, and, seeing that Sannier was filming, shot him in the chest with a pepper ball.

138.    Sannier's act of recording the Doe Defendant Officers did not interfere with the officers in any way.

139.    Sannier had a constitutionally protected right to record police officers' official actions in a public place.

140.    At the time, Sannier was exercising his constitutionally protected right to record police officers' official actions in a public place.

*May 30, 2020*

141.    On May 30, 2020, at approximately 4:00 p.m., Sannier marched with other peaceful protestors in the downtown area. There were approximately 1,000 protestors. While Sannier and other protestors were near the 16th Street Mall, between California and Welton, Doe Defendant Officers began shooting pepper balls at the protestors. There was no provocation by the protestors. At the time, Sannier

and other protestors were kneeling before the Officers and chanting "Hands up, don't shoot," and other protestors were laying down in front of him.

142.   On one or more days when the curfew was in effect, Sannier saw many non-protestors present in public places in Denver after curfew who were ignored by Doe Defendant Officers and were not shot at, tear gassed, pepper sprayed, or arrested.

*June 1, 2020*

143.   On June 1, 2020, Sannier joined other protestors who marched downtown. Sannier was with a few hundred other protestors on the Capitol lawn until midnight. The protest was peaceful.

144.   At midnight, dozens of Doe Defendant Officers came out of the shadows at the Capitol, and protestors began chanting, "Why are you in riot gear, I don't see no riot here."

145.   Sannier laid down in the street with other people linking arms. There were also protestors demonstrating against the police in a line.

146.   Doe Defendant Officers began marching onto the lawn. Without any warning or dispersal order or any words, the officers began tear gassing the demonstrators. The Doe Defendant Officers also used a noise cannon or some weapon that created an irregular strobing sound that was extremely disorienting. Sannier left.

147.   When Sannier got to Lincoln and Broadway and approximately 13th Avenue, there were approximately 50 Doe Defendant Officers there. The officers

surrounded Sannier and other medics in a corner and began dousing them with

pepper spray. The medics in front of Sannier were wearing gear clearly identifying

them as medics.

148.    Sannier was tackled from behind by a Defendant DPD Officer, believed

to be Defendant Tak. The officer said words to the effect of "Get on the fucking

ground!"

149.    Defendant Tak and (upon information and belief) Defendant J. LNU

arrested Sannier for curfew violation and failure to obey a lawful order.

150.    Neither Defendant Tak nor any other Officer gave Sannier any lawful

orders.

151.    Defendant Tak did not give Sannier multiple orders.

152.    Sannier was handcuffed and placed into a police van. There was a

younger protestor next to him who was also handcuffed and who was sobbing,

saying he could not breathe and needed his inhaler. Sannier tried to get him to calm

down. The younger protestor asked the Doe Defendant Officers for his inhaler; the

Doe Defendant Officers heard him and opened and closed the door numerous times,

but they ignored him.

153.    Sannier was detained in the jail for approximately 36 hours.

154.    In jail, Sannier saw Plaintiff Ambrose Cruz, who had a giant bruise

under his eye from being hit by a projectile. Cruz did not receive ice for his injury

for at least 12 hours.

155.    During all the days that Sannier attended the protests, he never heard any officer say anything to protestors before using "less-lethal" weapons on them. The only time that he heard an officer say anything was when he was arrested on June 1, 2020 and Defendant Tak tackled him to the ground, saying words to the effect of "Get on the fucking ground!"

156.    There was no lawful justification for the Defendant Officers' use of force described in the preceding paragraphs.

157.    On one or more days when he attended protests in Denver and during the events described above, Sannier experienced tear gas and/or pepper spray on numerous occasions, as described above, which caused coughing, difficulty breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the skin.

### Plaintiff Kelsey Taylor

158.    Plaintiff Kelsey Taylor protested in Denver on May 28 and 30, 2020 and other days. She protested the murder of George Floyd.

*May 28, 2020*

159.    On May 28, 2020, Taylor marched with protestors in the downtown area and north towards I-25. After the protestors got off the highway, they headed back towards the Capitol. There were likely over 100 people.

160.    Around Platte and the pedestrian bridge near Confluence Park, protestors stood there. Taylor heard one Doe Defendant Officer say something to the effect of, "If anyone moves, light 'em up." The officers began shooting pepper balls at the protestors without warning or any orders. Many people were injured.

27

161.   Taylor marched back to the Capitol with other protestors. At 14th Avenue and Sherman, there was a line of Doe Defendant Officers on 14th Avenue.

162.   Taylor and the other protestors stayed there about another hour, chanting, "Hands up, don't shoot," and "I can't breathe." Another group of protestors walked down 14th Avenue and joined Taylor's group of protestors. There were approximately 200 people.

163.   At some point, the Doe Defendant Officers tear gassed the entire crowd, without provocation. Taylor did not see anyone throw anything or get aggressive with the police. The officers gave no warning or orders. Taylor inhaled tear gas, which caused breathing and vision problems.

*May 30, 2020*

164.   On May 30, 2020, Taylor went to the Capitol at around 5:00 or 6:00 p.m. to protest. She stood with other peaceful protestors on 14th Avenue in front of the Capitol building.

165.   Any time there was the slightest agitation in the crowd, even if it was non-violent, the Doe Defendant Officers started shooting pepper balls and throwing tear gas without giving any warnings or orders. The Doe Defendant Officers also shot into the crowd whenever protestors walked forward closer to Colfax.

166.   Taylor was hit by pepper balls, which caused bruises. She also inhaled tear gas.

167.   After curfew, at 14th Avenue and Broadway by the public library, Taylor was with approximately 100 other demonstrators peacefully protesting the

curfew itself. Taylor and the other demonstrators knelt in the intersection of 14th Avenue and Broadway. The Doe Defendant Officers formed a line. They were in full riot gear and had batons and/or truncheons. They advanced towards the protestors. Taylor and the others remained kneeling. They began jabbing people, including Taylor, with batons.

168.    Taylor saw one officer hit a Black man across his chest with his baton. Taylor said words to the effect of, "You can't do that, he's not hurting you, he's unarmed." Another Doe Defendant Officer grabbed Taylor's arm and told her that she was under arrest. Taylor heard another officer say, "Get me three more."

169.    Taylor was arrested by Doe Defendant DPD Officers for violation of curfew and failure to obey lawful order.

170.    No officers gave Taylor any lawful orders.

171.    No officers gave Taylor multiple orders.

172.    After Taylor's arrest, she was eventually put into a police van. It was very hard for her to breathe because she has asthma and had been hit by tear gas and pepper balls.

173.    Taylor was taken to jail. She was released from jail the next morning.

174.    There was no lawful justification for the Doe Defendant Officers' use of force described in the preceding paragraphs.

175.    On one or more days when she attended protests in Denver and during the events described above, Taylor experienced tear gas and/or pepper spray on numerous occasions, as described above, which caused coughing, difficulty

breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the skin. This was especially difficult for Taylor because she has asthma.

### Plaintiff Francesca Lawrence

176.    Plaintiff Francesca Lawrence participated in the protests on May 30 and 31, 2020. She went to the protests to be a medic and try to help protestors who were injured.

177.    On May 31, 2020, Lawrence went out at around 8:00 p.m., after curfew, in order to help protestors because she believed that the violence against the protestors would be worse after curfew.

178.    Lawrence went to Colfax, near downtown. For about the first hour, things were calm. However, Doe Defendant Officers then began shooting tear gas and pepper spray at the peaceful protestors and people ran. The officers did not give any warnings or dispersal orders before using their "less-lethal" weapons on the protestors.

179.    Lawrence tried to leave because she did not feel safe anymore and was trying to find her way back to her car. She heard a bunch of other protestors screaming and running behind her, and they got cornered in an alley at 10th Avenue and Acoma by approximately 10-15 Defendant DPD Officers, including Defendants Velasquez, Nielsen, Moldenhauer, Vaporis, Beasley, Novotny, Cochran, and (upon information and belief) Davis.

180.    Lawrence did not throw anything at the officers.

181.   Lawrence did not see any of the other protestors throw anything at the officers.

182.   The protestors were trapped in the alley and had nowhere to go.

183.   Despite the fact that the protestors were nonviolent and trapped, one or more of the Defendants, Velasquez, Nielsen, Moldenhauer, Vaporis, Beasley, Novotny, Cochran, and Davis, and/or other unnamed Defendant DPD Officers shot a tear gas canister into the alley. They did this without warning or giving any orders.

184.   One or more of the Defendant Officers, Velasquez, Nielsen, Moldenhauer, Vaporis, Beasley, Novotny, Cochran, and Davis, and/or Doe Defendant DPD Officers shot "less-lethal" weapons at the protestors at very close range. They did this without warning or giving any orders.

185.   One or more of the Defendant Officers, Velasquez, Nielsen, Moldenhauer, Vaporis, Beasley, Novotny, Cochran, and Davis, and/or Doe Defendant Officers also shot people who were standing up against the wall. They did this without warning or giving any orders.

186.   Lawrence was tear gassed and pepper sprayed with the other protestors, by one or more of the Defendant Officers, Velasquez, Nielsen, Moldenhauer, Vaporis, Beasley, Novotny, Cochran, and Davis, and/or other Doe Defendant DPD Officers. This caused coughing, difficulty breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the skin.

187.    Each of these Defendant Officers, including Velasquez, Nielsen, Moldenhauer, Vaporis, Beasley, Novotny, Cochran, Davis, and/or Doe Defendant DPD Officers had the opportunity to intervene to stop this excessive use of force by other officers, but they did not do so.

188.    Lawrence was arrested by Defendants Velasquez and (upon information and belief) Davis for curfew violation and failure to obey lawful order.

189.    Neither Defendant Velasquez nor any other Officer gave Lawrence any lawful orders.

190.    Neither Defendant Velasquez nor any other Officer gave Lawrence multiple orders.

191.    There were approximately 20-25 people arrested at the same time at that location.

192.    The Defendant Officers took people's masks away.

193.    Lawrence was transported to the jail in a van.

194.    At the jail, there were many people in holding cells, but their masks had been taken away and the jail did not provide masks at that point.

195.    At the jail, Lawrence saw a protestor whose thigh was black and blue from being hit by a rubber bullet; one who had been beaten by a baton before her arrest; and another who had been hit in the face with a projectile and his face was covered in blood.

196.    There was no lawful justification for the Defendant Officers' use of force described in the preceding paragraphs.

197.    Lawrence was released from jail on the morning of June 2, 2020.

198.    Lawrence saw many non-protestors present in public places in Denver after curfew on May 31, 2020 who were ignored by the Defendant Officers and were not shot at, tear gassed, pepper sprayed, or arrested.

**Plaintiff Youssef Amghar**

199.    Plaintiff Youssef Amghar participated in the protests on May 29 and 30, 2020. Amghar wanted to protest police brutality against Black and Brown people.

200.    On May 30, 2020, about an hour or so before curfew, Amghar was with other peaceful protestors on the corner of Colfax and Lincoln. Protestors were chanting, "Hands up, don't shoot," and holding signs.

201.    There was a line of Doe Defendant Officers on Colfax.

202.    Upon information and belief, this group of Doe Defendant Officers included DPD officers.

203.    Amghar was standing on the sidewalk.

204.    Amghar stood there with their hands up.

205.    Someone else in the crowd not near Amghar threw a water bottle in the general direction of the officers.

206.    Without attempting to investigate or isolate that person, the Doe Defendant Officers (who were in riot gear) immediately began shooting into the crowd with pepper balls.

207.   The Doe Defendant Officers did this without warning or giving any orders.

208.   At first, the Doe Defendant Officers shot indiscriminately into the crowd, but after the crowd moved back, they began shooting directly at Amghar, even though they were standing still with their hands up.

209.   Amghar was approximately 10-15 feet from the Doe Defendant Officers at the time.

210.   The Doe Defendant Officers first shot Amghar in the arms and legs, then in the chest, and then directly in the face, even though they continued standing still with their hands up.

211.   The Doe Defendant Officers shot Amghar approximately 14 times.

212.   Amghar had many bruises from the pepper balls shot at them.

213.   The Doe Defendant Officers did not give any orders before, during, or after shooting Amghar. No one told Amghar to move back or gave them any other orders.

214.   Amghar was so upset at the officers' use of force on them that they began yelling words to the effect of, "I'm a goddamn U.S. Marine, what are you doing?"

215.   Then the Doe Defendant Officers began throwing tear gas canisters at their feet. After a couple minutes, Amghar walked away and took cover behind a tree.

216.   After curfew, in a different location, Doe Defendant Officers kettled Amghar with other protestors and then opened fire with pepper balls without giving any orders or warnings. Amghar did not see protestors do anything to provoke or warrant this use of force.

217.   Doe Defendant Officers also chased Amghar and other protestors into alleys, trying to force them into places where they were cornered, so that they could shoot "less-lethal" weapons at them.

218.   There was no lawful justification for the Doe Defendant Officers' use of force described in the preceding paragraphs.

219.   On one or more days when they attended protests in Denver and during the events described above, Amghar experienced tear gas and/or pepper spray on numerous occasions, as described above, which caused coughing, difficulty breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the skin.

**Plaintiff Ambrose Cruz**

220.   Plaintiff Ambrose Cruz went to the protests on June 1, 2020. As a photographer and freelance journalist, he wanted to document the protests as well as the police response. He has also been the victim of police violence in the past. Throughout the evening, he documented the protests and police action as a photojournalist.

221.   Cruz had a First Amendment right to document the protests and police action as a photojournalist.

35

222.     Cruz went out to document the protests on June 1, 2020 at about 8:00 p.m. He was with protestors in front of the Capitol. The protestors were chanting and peaceful. There were over 100 people present. There was a line of Doe Defendant Officers present on all sides of the protestors, surrounding them.

223.     Sometime after 9:00 p.m., Doe Defendant Officers moved in and began rapidly shooting tear gas and foam bullets at the protestors. They did not give any warning or orders. Because the police had surrounded the protestors on all sides, it was difficult for protestors to escape.

224.     Cruz ran away from the gas. At approximately 13th Avenue, he saw a man in an electric wheelchair. The man was stuck and Cruz tried to help. However, the wheelchair was extremely heavy. Unfortunately, Cruz had to leave him there while he was being engulfed by tear gas.

225.     Cruz ran towards the library. Around 13th Avenue, the Doe Defendant Officers were shooting at him and protestors with tear gas and pepper balls. There were a lot of people who were trying to leave to go home.

226.     There were approximately 35 people at that corner, and they were all younger protestors, including teenagers. Almost all of them were Black. One protestor was having a seizure. Cruz and others tried to help him.

227.     Some people tried to leave, but Doe Defendant Officers cornered them and shot pepper balls at them. A white person went up to the officers to ask if they could leave because people wanted to go home. A Doe Defendant Officer said that

they could go home, and so people started walking towards where the officer told them to go. That officer started firing on people and everyone started running.

228.    Cruz ran with other protestors to a building and garage at 13th Avenue and Lincoln. The Doe Defendant Officers ran after them. The officers were shooting them with pepper balls. They did not give any orders or warnings.

229.    Cruz and others ran down to the garage but discovered that both ends of the block were blocked off by armored vehicles and there was no exit.

230.    Cruz ran up the stairs, and as he looked up, a male Defendant DPD Officer shot him in the face with pepper balls. The Defendant DPD Officer hit him three times in the eye area and knocked his glasses off.

231.    A female Defendant DPD Officer, believed to be Defendant Jossi, told Cruz, "If you don't fucking get on the ground, I'm going to fucking kill you," or words to that effect. Cruz was already on the ground, unarmed, and presented no threat or resistance.

232.    Even though Cruz had already stopped and was on the ground, the other Defendant DPD Officer continued firing pepper balls at him, including at the back of his head.

233.    Defendant Jossi had the opportunity to intervene to stop this use of excessive force but did not do so.

234.    Cruz was placed in handcuffs.

235.    Cruz's eye was bleeding, swollen shut, and bruised. He could not open his eye.

236.    The Defendant DPD Officer who had been repeatedly firing pepper balls at Cruz at close range taunted him about his bruised and bloody eye, saying things like, "What happened to you? It looks like your wife beat you. I'd say that was two days old, this must have happened another night."

237.    A month after the attack, Cruz still has light sensitivity and other problems with his eyesight.

238.    Defendants Jossi and (upon information and belief) Hogan arrested Cruz for curfew violation and failure to obey lawful order.

239.    Neither Defendants Jossi nor Hogan nor any other Officer gave Cruz any lawful orders.

240.    Defendant Jossi did not give Cruz multiple orders that he failed to obey.

241.    Defendant Hogan falsely marked on Cruz's summons and complaint form that he had "no injury."

242.    Cruz was detained in the jail overnight.

243.    There was no lawful justification for the Defendant Officers' use of force described in the preceding paragraphs.

244.    The serious injury inflicted on Cruz by Defendant Officers suppressed and cut short his ability to exercise his First Amendment rights, not only on that day but afterwards.

245.    Cruz feared the weapons and excessive force that the Defendant Officers were using and did not return to exercise his First Amendment right as a photojournalist to document the protests as a result.

246.    On one or more days when he attended protests in Denver and during the events described above, Cruz experienced tear gas and/or pepper spray on numerous occasions, as described above, which caused coughing, difficulty breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the skin.

### Plaintiff Johnathen "De La Vaca" Duran

247.    Plaintiff Johnathen "De La Vaca" Duran attended the protests in Denver on May 30 and 31, 2020, as a journalist and editor from Yellow Scene magazine. Yellow Scene magazine is a publication based in Boulder County which provides coverage of local and regional news, politics, art, culture, entertainment, and cuisine. De La Vaca is a credentialed member of the media with a press pass.

*May 30, 2020*

248.    On May 30, 2020, De La Vaca documented the protests as a member of the media.

249.    In the late afternoon, De La Vaca was in Civic Center Park. Even though it was hours before curfew, Doe Defendant Officers appeared to be attempting to disperse peaceful protestors from Civic Center station.

250.    Doe Defendant Officers used chemical agents, including smoke bombs, pepper balls, and flashbang grenades on protestors. The officers did not give any warnings or orders before they started shooting things at the protestors.

251.    De La Vaca was shot with pepper balls at that time, when he was photographing the police.

252.    At the time, De La Vaca was wearing his press pass, which is very large and visible.

253.    De La Vaca then went over to the Capitol, where he was teargassed.

254.    There was no apparent reason or justification for the Doe Defendant Officers' use of tear gas at that time. De La Vaca's face was red and painful from the tear gas.

255.    De La Vaca went to the corner of Lincoln, east of Civic Center station, but there was another police assault at that time and he inhaled a big waft of tear gas. It was painful and difficult to breathe. He choked and threw up.

*May 31, 2020*

256.    On May 31, 2020, De La Vaca went to document the protests at about 4:00 or 5:00 p.m. There were multiple marches and rallies that occurred downtown.

257.    De La Vaca was wearing his press pass and a hard hat that said "media" in large letters all over it.

258.    After curfew, De La Vaca continued documenting the protests as a credentialed member of the media by taking photos and recording videos.

259.    On Colfax, near the Ogden Theatre, Doe Defendant Officers began throwing flashbang grenades and tear gas canisters at the protestors. Doe Defendant Officers were also shooting pepper balls from the rooftops.

260.   De La Vaca did not hear any warnings or orders from the Doe Defendant Officers.

261.   This police assault caused the protestors to spread out in different directions. Some protestors were providing medical aid to other protestors.

262.   A march went down a side street, and De La Vaca followed it, continuing to do his job as a journalist.

263.   Then, De La Vaca walked back towards the Capitol, and he saw Doe Defendant Officers trying to kettle protestors near Colfax and Emerson Street. De La Vaca was trying to document by recording the protest and the police.

264.   There was a line of police by the Basilica near the McDonald's on Colfax, near Pennsylvania.

265.   De La Vaca was facing a line of police, there was some kind of commotion, and he and others backed away from the police. De La Vaca was covering the events as a journalist when he was shot in the groin with a foam/rubber bullet at approximately the intersection of Colfax and Pearl Street.

266.   The pain from being shot in the groin was some of the worst pain De La Vaca had ever felt. He thought that he was going to lose a testicle.

267.   De La Vaca went to the Basilica at Logan and Colfax, in order to take shelter and also trying to continue to film.

268.   The Doe Defendant Officers kettled protestors at the Basilica. The officers shot chemical agents, including pepper balls, and flashbang grenades, at the protestors.

269.   De La Vaca did not see the protestors do anything to provoke or warrant the chemical agents.

270.   De La Vaca estimates that there were upwards of 100 to 150 people at that location at that time.

271.   Eventually, De La Vaca left that location and tried to get back to his car to go home. He was limping and holding himself. He ran into two medics, who provided him with acetaminophen and ice packs and asked him for a ride out of the area. He gave them a ride.

272.   De La Vaca's testicles were severely swollen. It took two to three days before he could walk normally, but he continues to have pain.

273.   There was no lawful justification for the Doe Defendant Officers' use of force described in the preceding paragraphs.

274.   The Doe Defendant Officers' use of force cut short De La Vaca's exercise of his First Amendment rights. The serious injury inflicted on him by Doe Defendant Officers suppressed and cut short his ability to exercise his First Amendment rights, not only on that day but on several days afterwards.

275.   On one or more days when he attended protests in Denver and during the events described above, De La Vaca experienced tear gas and/or pepper spray on numerous occasions, as described above, which caused coughing, difficulty breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the skin.

## Class Allegations

276.    **Class Definition, Rule 23(b)(2):** This class is defined as all persons who have in the past participated, presently are participating, or may in the future participate in, or be present at, demonstrations within the City and County of Denver in the exercise of their rights of free speech, press, assembly and petition in general, and particularly as it relates to protesting police violence and discrimination against people of color, especially Black people. (Henceforth referred to as the "Injunctive Relief Class.")

277.    **Class Definition, Rule 23(b)(3):** One or more of the named Plaintiffs (which are indicated for each class or subclass) bring this action individually and on behalf of a proposed class of all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(1), (b)(2), and (b)(3). These classes are defined as:

> a.    **Direct Force Class:** Beginning May 28, 2020, and continuing until judgment or other resolution of this case, all persons present at or during the aftermath of protests in the City and County of Denver, who were shot with so-called "less-lethal" weapons and/or inhaled an aerosolized chemical agent (including, but not limited to, CS or OC). The Class Representatives for this class are Ambrose Cruz, Youssef Amghar, Sara Fitouri, Jacquelyn Parkins, Francesca Lawrence, Kelsey Taylor, Andy Sannier, Joe Deras, and Johnathen De La Vaca.

> b.    **Arrest Class:** Beginning May 28, 2020, and continuing until judgment or other resolution of this case, all persons present at or

during the aftermath of protests in the City and County of Denver,

who were arrested by the DPD on charges of violating curfew. The

Class Representatives for this class are Ambrose Cruz, Francesca

Lawrence, Kelsey Taylor, and Andy Sannier.

278.    Plaintiffs and the putative class were subjected to the constitutional

violations described in this complaint. The legal and factual issues are common to

the class and affect all class members.

279.    Plaintiffs reserve the right to amend or modify the class definitions

with greater specificity or division after having had an opportunity to conduct

discovery.

## Numerosity

280.    Each class is inclusive of people present to protest and those otherwise

present in the vicinity as bystanders, journalists, or medics. Consistent with

Federal Rule of Civil Procedure 23(a), the members of the class are so numerous

that joinder of all members is impracticable. The Injunctive Relief Class is

composed of thousands of people. The Arrest Class exceeds 300 people. The Direct

Force Class consists of more than 1,000 people.

## Common Issues of Fact or Law

281.    Although the actions complained of in this Complaint occurred at

different times and locations, Defendants acted uniformly with respect to each class.

For example, Defendants consistently tear gassed and shot projectiles or "less-

lethal" weapons at peaceful protestors without warning, orders, or any lawful

justification.

44

282.   Plaintiffs are informed and believe and thereon allege that the DPD officers and those officers assisting them pursuant to their mutual aid network acted in accordance with orders given by supervisors from the highest command positions, in accordance with policies and procedures instituted by the DPD and the City.

283.   There are questions of law and fact common to the classes and they predominate over individualized questions. These common questions of fact and law include but are not limited to:

*Fact:*

a.   Did the Defendant City impose a curfew without accommodating, or attempting to accommodate, the right to peaceable assembly and protest?

b.   Did Defendants enforce the Defendant City's curfew in a discriminatory manner against protestors?

c.   Did Defendants routinely break up protests without warning and without providing directions, means, and opportunity to disperse before taking aggressive, injurious, and potentially deadly police action?

d.   Did Defendants routinely break up protests through the use of force without regard to whether the individuals against whom such force was used were engaged in conduct justifying such force?

e.      Did Defendants routinely, while breaking up protests, hit people with projects or use chemical agents on them although those people were not engaging in conduct justifying such force?

f.      Did some or all of the conduct described above constitute a policy or custom of the Defendant City?

*Law:*

a.      Must the Defendant City, when imposing a curfew based on the past conduct of some people that is unlawful, accommodate, or attempt to accommodate, the right to peaceable assembly and protest?

b.      Did the Defendant City have the legal authority to impose the curfew that it did?

c.      Must Defendants, when enforcing a curfew, enforce it in a manner that does not discriminate against protestors in violation of the First and Fourteenth Amendments?

d.      Were the Defendants' arrests of curfew violators an unreasonable seizure under the Fourth Amendment?

e.      Did Defendant routinely break up protests through the use of force without regard to whether the individuals against whom such force was used were engaged in conduct justifying such force violate the First, Fourth, or Fourteenth Amendments?

f. Must Defendants provide warning and directions, means, and opportunity to disperse before taking aggressive, injurious, and potentially deadly police action, under the First, Fourth, or Fourteenth Amendments?

g. Did the Defendant City manifest a failure to adequately train and supervise its police officers and members of its mutual aid network to properly utilize tear gas, flashbang grenades, rubber bullets, and other "less-lethal" weapons?

h. Did the Defendant City manifest a failure to provide adequate policies and procedures to its police officers and members of its mutual aid network to properly utilize tear gas, flashbang grenades, rubber bullets, and other "less-lethal" weapons?

i. Did the Defendant City manifest a failure to adequately train and supervise its police officers and members of its mutual aid network to respect the First Amendment rights of individuals attending or participating in protests, or the First Amendment rights of members of the press?

j. Did the Defendant City exhibit deliberate indifference to the unconstitutional conduct complained of herein?

k. Are there classwide damages available to the various classes?

284. Defendants seized, detained, and/or arrested the putative classes as a group and treated all similarly, acting on grounds applicable to the putative class. The named Plaintiffs' claims that the First, Fourth, and Fourteenth Amendment rights were violated raise common questions of law and fact. The Defendants have

47

acted, threaten to act, and will continue to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or declaratory relief with respect to the class as a whole.

## Typicality

285.    Consistent with Federal Rule of Civil Procedure 23(a), the claims of the representative Plaintiffs are typical of the class. Plaintiffs were all present at the protests in the City of Denver; were subjected to one or more of the violations previously enumerated; and seek redress for the past violations of their rights and protection to bar the repeat of those violations in the future.

286.    Thus, Plaintiffs have the same interests and have suffered the same type of damages as the class members. Plaintiffs' claims are based upon the same or similar legal theories as the claims of the class members of each class. Each class member suffered actual damages as a result of being subjected to one or more of the violations enumerated above. The actual injuries suffered by Plaintiffs are similar in type to the actual damages suffered by each class member although the severity of those injuries may vary among class members.

287.    Consistent with Federal Rule of Civil Procedure 23(a), the representative Plaintiffs will fairly and adequately protect the interests of the class. The interests of the representative Plaintiffs are consistent with and not antagonistic to the interests of the class.

## Adequate Representation

288.    The named Plaintiffs will fairly and adequately represent the common class interest. The named Plaintiffs have a strong interest in achieving the relief

requested in this Complaint, they have no conflicts with members of the Plaintiff class, and they will fairly and adequately protect the interests of the class.

289.    The named Plaintiffs are presented by counsel, Loevy & Loevy, who are well-experienced in civil rights and class action litigation and are familiar with the issues in this case. Loevy & Loevy has successfully litigated numerous class action cases, including for civil rights violations. Loevy & Loevy has tried two class actions to verdict and has successfully litigated other class action cases as class counsel. This includes *Young v. County of Cook*, Case No. 06-CV-552 (N.D. Ill.), concerning unconstitutional strip searches of inmates, and a related case against Cook County's former insurers, in which Loevy & Loevy secured $107 million in settlements after winning a trial on liability and multiple damages trials in the original case and another trial in the case against the insurance companies for improperly denying coverage. Other examples include: Loevy & Loevy obtained a $7.2 million settlement in *Flood v. Dominguez*, Case No. 08-CV-153 (N.D. Ind.), and a $16.5 million settlement in *Dunn v. City of Chicago*, No. 04-CV-6804 (N.D. Ill.), both concerning the unconstitutional treatment of inmates held in lockup.

290.    Counsel for the named Plaintiffs know of no conflicts among the between members of the class, the named Plaintiffs, or the attorneys in this action.

## Maintenance and Superiority

291.    Consistent with Federal Rule of Civil Procedure 23(b)(1)(A), prosecutions of separate actions by individual members of the classes would create a risk that inconsistent or varying adjudications with respect to individual members

of the class would establish incompatible standards of conduct for the parties opposing the class.

292.    Consistent with Federal Rule of Civil Procedure 23(b)(1)(B), prosecutions of separate actions by individual members of the classes would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, substantially impair or impede the interests of the other members of the classes to protect their interests.

293.    Consistent with Federal Rule of Civil Procedure 23(b)(2), Defendants have acted on grounds generally applicable to the classes.

294.    Consistent with Federal Rule of Civil Procedure 23(b)(3), the questions of law or fact common to the members of the classes predominate over any questions affecting only individual members, and this class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties. Plaintiffs are informed and believe, and allege thereon, that the interests of class members in individually controlling the prosecution of a separate action is low in that most class members would be unable to individually prosecute any action at all. Plaintiffs are informed and believe, and thereon allege, that the amounts at stake for individuals are such that separate suits would be impracticable in that most members of the class will not be able to find counsel to represent them. Plaintiffs are informed and believe, and thereon allege, that it is desirable to concentrate all litigation in one forum because all of the claims arise in the same location, *i.e.*, the City and County of Denver. It will promote judicial

efficiency to resolve the common questions of law and fact in one forum rather than in multiple courts.

295.   Plaintiffs do not know the identities of most class members. Plaintiffs are informed and believe, and thereon allege, that the identities of the class members are ascertainable in significant part from DPD records, at least as it relates to those class members who were arrested. Plaintiffs are informed and believe, and thereon allege, that a significant number of class members may be reached by the use of outreach efforts by organizations that participated in organizing the affected protests.

296.   Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. The class action is superior to any other available means to resolve the issues. Liability and general damages can be determined on a classwide basis.

297.   Consistent with Rule 23(b)(3), class members must be furnished with the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. Plaintiffs are informed and believe that DPD computer records contain a last known address for class members who were arrested. Plaintiffs contemplate that individual notice be given to class members at such last known address by first class mail, email and cell phone outreach, social media and efforts of organizations that organized the protests.

298.   Pursuant to Rule 23(c)(4), particular issues are appropriate for certification—namely the issues described in paragraph 283, above, because resolution of such issues would advance the disposition of the matter and the parties' interests therein.

## Damages

299.   As a direct and proximate cause of the conduct described herein, the named Plaintiffs and the class members have been denied their constitutional rights as stated herein, and have suffered damages, including but not limited to, mental and emotional distress, physical injuries and bodily harm, pain, fear, humiliation, embarrassment, discomfort, and anxiety, and other damages.

300.   Defendants' actions were done with conscious or reckless disregard for, and deliberate indifference to, Plaintiffs' and class members' rights.

301.   One or more named Plaintiffs and class members have a reasonable fear of attending protests in Denver in the future due to the cumulative effect of the violence and misconduct by the Defendants. Without intervention by this Court, the Injunctive Relief Class members, who have participated in and wish to participate or attend protest activities, particularly related to police brutality, are at risk of having their rights violated in the future due to the Defendants' demonstrated pattern of constitutional violations and threatened future actions. The Injunctive Relief Class has no adequate remedy at law to protect the future lawful exercise of their constitutional rights, and, without action by this court, will suffer irreparable

injury, thereby entitling them to injunctive and declaratory relief. The Injunctive Relief Class is represented by each of the individual class representatives.

302.   Defendants have acted and refused to act on grounds generally applicable to the putative class. Injunctive and declaratory relief for the putative class as a whole is appropriate.

303.   Defendants' policies, practices, customs, conduct, and acts alleged herein resulted in, and will continue to result in, irreparable injury to the Plaintiffs, including but not limited to violation of their constitutional and statutory rights. Plaintiffs have no plain, adequate, or complete remedy at law to address the wrongs described herein. The Plaintiffs and class members intend in the future to exercise their constitutional rights of freedom of the press, speech, and assembly by engaging in expressive activities in the City and County of Denver. Defendants' conduct described herein has created uncertainty among Plaintiffs with respect to their exercise now and in the future of these constitutional rights, and has chilled their exercise of these rights.

304.   Specifically, Plaintiffs are concerned that they will be subjected to unreasonable and excessive force by the DPD and/or unreasonable seizures.

305.   Plaintiffs are also concerned that, when engaged in or documenting protest activities, Defendants will impose curfews without accommodating or attempting to accommodate First Amendment rights; will not provide adequate notice before attempting to disperse assemblies; will not provide adequate means

and opportunity to disperse; and will again employ indiscriminate, unreasonable or excessive force, injuring and terrifying protestors.

306.   Plaintiffs therefore seek injunctive relief from this court to ensure that Plaintiffs and persons similarly situated will not suffer violations of their rights from Defendants' illegal and unconstitutional policies, customs, and practices described herein.

### The City and County of Denver's Polices, Practices, and Customs

307.   The Defendants have engaged in repeated, widespread violations of law, as outlined above, over the course of several nights, shutting down the exercise of First Amendment activities through the use of indiscriminate and unreasonable force against thousands of protestors; imposing citywide curfews without accommodating, or even attempting to accommodate, the right to peaceable assembly and protest; at times dispersing lawful and peaceful assemblies without warning and without providing both directions, means, and opportunity to disperse before taking aggressive police action; hitting at least hundreds of protestors with "less-lethal" weapons and/of tear gassing or pepper spraying them; selectively enforcing the curfew against protestors by arresting them for violation of an unlawful curfew and thereby placing them at great risk of exposure to COVID-19;[1] and harassing, intimidating, and/or using force on individuals attempting to record or document police activity in public. In conjunction with a history of protest-related constitutional violations, Defendants' repeated widespread and unlawful acts over

---

[1] The Van Cise-Simonet Detention Center, where arrestees were taken, is the site of one of the largest COVID-19 outbreaks in the country.

several nights and involving many locations constitute an unlawful custom and policy of violating protest participants' constitutional rights.

308. The Defendant City failed to train its officers in the constitutional responses to peaceful demonstrations, despite the history of such violations in the past and despite the obvious need for such training. The recurrence of the same violations with respect to these protestors indicates an intentional refusal to preserve the constitutional rights of protestors.

309. The Defendant City failed to adopt adequate policies in the constitutional responses to peaceful demonstrations, despite the history of such violations in the past and despite the obvious need for adequate policies. The recurrence of the same violations with respect to these protestors indicates an intentional refusal to preserve the constitutional rights of protestors.

310. For instance, the DPD and Defendant City have been called on numerous times dating back at least to 2011 to investigate its use of pepper balls and other chemical agents against protestors.

311. After Denver police fired pepper balls at peaceful protestors on October 29th, 2011 during the Occupy Denver demonstrations in Civic Center Park, the Defendant City received several complaints and conducted an internal debriefing.

312. Despite receiving notice of the DPD's unconstitutional actions, the Defendant City and DPD deliberately chose not to conduct any further review of the department's less-than-lethal force policy, despite the patently unlawful way in which pepper ball guns had been used against protestors and against the

recommendation of the Office of the Independent Monitor, which described the decision not to examine the incident and the underlying policies as a "missed opportunity."

313.    The Defendant City's policy, practice, and custom of authorizing officers to use "less-lethal" weapons to control and suppress protests was the moving force behind the violations of Plaintiffs' and class members' constitutional rights.

314.    These violations are also a direct result of the Defendant City's use of the services of law enforcement officers from other jurisdictions, who were also authorized to use "less-lethal" weapons to control and suppress protests.

315.    The Defendant City and its final policymakers have acted with deliberate indifference to the constitutional rights of protestors by authorizing, both explicitly and implicitly, the use of "less-lethal" force against protestors who do not pose any safety threat; by failing to properly train, supervise, and discipline officers regarding the proper use of force against protestors; by failing to rectify the unconstitutional custom of officers using "less-lethal" force to control and suppress demonstrations; and by failing to provide adequate policies. This constituted a conscious choice by the Defendant City not to properly train, supervise, discipline, rectify, or provide adequate policies on these issues.

316.    Moreover, the Defendant City is responsible for the actions of any non-DPD officers whose services were used during the protests. By using those services, the Defendant City was required to ensure that all officers complied with protestors' constitutional rights.

317.   DPD Chief of Police Paul Pazen was fully knowledgeable and apprised of the actions of Defendant Officers described above and, upon information and belief, was on site on one or more days of the protest, observing this DPD operation, without repudiating or stopping the actions of the Defendant Officers, thereby ratifying them.

318.   Moreover, on the morning of May 29, 2020, Mayor Michael Hancock and Chief Pazen publicly praised Defendant Officers for their "great restraint" and "tremendous restraint" during protests in Denver and said that the actions of the DPD in the use of "less-lethal" weapons against protestors was proper.

319.   Thus, the Defendant City, through its final policymakers, ratified the conduct of the Defendant Officers.

320.   This caused the violence and misconduct by Defendant Officers to continue that day and in the days after the Mayor and the Chief of Police made these comments.

321.   The Defendant City's final policymakers have received ample notice that officers were using "less-lethal" force against protestors to control and suppress demonstrations in the absence of any imminent threat to safety, including 150 complaints about the DPD in one 72-hour period, and widely publicized videos and firsthand accounts circulated through the local, state, and international press.

322.   Furthermore, the Defendant City's curfew described above was an official policy of the City which was unconstitutional.

323. The violations of the constitutional rights of the Plaintiffs who were arrested and the Arrest Class members were a direct result of the Defendant City's official, unconstitutional policy.

## Count I: 42 U.S.C. § 1983 – First Amendment

324. Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

325. Defendants violated Plaintiffs' and class members' rights under the First Amendment of the United States Constitution.

326. In the manner described more fully above, the Defendant City's curfew was unconstitutionally applied to protestors. The City had adopted an official policy of selectively enforcing the curfew against protestors. This was designed to further suppress Plaintiffs' and the Arrest Class members' protected First Amendment activities including the right to free speech, expression, and assembly, and it violated the First Amendment.

327. The Defendant City's curfew also violated the First Amendment in that it provided no exceptions for First Amendment-protected activity.

328. In the manner described more fully above, Defendants violated Plaintiffs' and the Direct Force Class members' First Amendment rights when they attempted to control and break up the peaceful protests by using "less-lethal" weapons on and/or kettling the Plaintiffs and class members without warning, dispersal orders, adequate time to disperse, or any lawful justification whatsoever.

These actions were undertaken in order to discourage and suppress the exercise of Plaintiffs' and class members' First Amendment rights.

329.   Furthermore, the right to gather, receive, record, and disseminate information is grounded in the Free Speech Clause of the First Amendment, as well as the Petition Clause, if the purpose of gathering, receiving, or recording the information is to use it to petition the government for redress of grievances, and the Free Press Clause, if the purpose of gathering, receiving, or recording the information is to publish and disseminate it to other people.

330.   The First Amendment right to gather, receive, record, document, and disseminate information includes the right to photograph, audio and video record police officers performing their duties in public, as well as the right to photograph, audio and video record demonstrations.

331.   Police officers performing their public duties in public places have no reasonable expectation that their conduct is private and will not be recorded, documented, published, and disseminated.

332.   Defendant Officers' actions in using "less-lethal" weapons on individuals recording or documenting police officers performing their public duties in public places violated the First Amendment rights of Plaintiffs and the Direct Force Class members.

333.   Defendant Officers' actions in using "less-lethal" weapons on protestors in order to control and suppress their speech violated the First Amendment rights of Plaintiffs and the Direct Force Class members.

334.    The misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of the Defendant City. The policies, practices, and customs of the Defendant City were the moving force behind the misconduct described in this Count and the violation of Plaintiffs' and class members' rights.

335.    The Defendant City is liable because the violation of Plaintiffs' and class members' rights as described in this Count was caused by the policies, practices, or customs of the relevant policymakers for the City.

336.    In the manner described more fully above, the need for policies, training, and supervision of officers on how to handle the use of force on protestors was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the Defendant City can reasonably be said to have been deliberately indifferent to the need.

337.    As a direct and proximate result of Defendants' actions, Plaintiffs' and class members' constitutional rights were violated, entitling them to relief.

## Count II: 42 U.S.C. § 1983 -- Fourth Amendment

338.    Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

339.    In the manner described more fully above, Defendants Velasquez, Davis, Hogan, Jossi, Tak, LNU, and Doe Defendants violated Plaintiffs' and the Arrest Class members' rights to be free from unreasonable seizure when they arrested Plaintiffs and class members without any lawful justification.

340.    Defendants violated Plaintiffs' and Direct Force Class members' rights to be free from unreasonable and excessive force under the Fourth Amendment

when Defendant Officers kettled them, or used "less-lethal" weapons on them while they presented no threat and without an individualized determination of individual conduct justifying such force, or used such weapons specifically to suppress their expressive activity.

341.   The misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of the Defendant City. The policies, practices, and customs of the Defendant City were the moving force behind the misconduct described in this Count and the violation of Plaintiffs' and class members' rights.

342.   The Defendant City is liable because the violation of Plaintiffs' and class members' rights as described in this Count was caused by the policies, practices, or customs of the relevant policymakers for the City.

343.   In the manner described more fully above, the need for policies, training, and supervision of officers on how to handle the use of force on protestors was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the Defendant City can reasonably be said to have been deliberately indifferent to the need.

344.   As a direct and proximate result of Defendants' actions, Plaintiffs' and class members' constitutional rights were violated, entitling them to relief.

## Count III: 42 U.S.C. § 1983 -- Fourteenth Amendment
### Due Process and Equal Protection

345.   Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

346.    In the manner described more fully above, Defendants violated Plaintiffs' and the Direct Force Class members' rights to due process when they affirmatively and indiscriminately used "less-lethal" weapons and/or kettled Plaintiffs and class members without any lawful justification. Furthermore, this conduct was deliberately indifferent to the Plaintiffs and class members' rights, shocks the conscience, and violated the decencies of civilized conduct, under the Fourteenth Amendment.

347.    In the manner described more fully above, Defendants Velasquez, Davis, Hogan, Jossi, Tak, LNU, and Doe Defendants violated Plaintiffs' and Arrest Class members' rights to due process and equal protection when they arrested them for violation of the curfew.

348.    The misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of the Defendant City. The policies, practices, and customs of the Defendant City were the moving force behind the misconduct described in this Count and the violation of Plaintiffs' and class members' rights.

349.    The Defendant City is liable because the violation of Plaintiffs' and class members' rights as described in this Count was caused by the policies, practices, or customs of the relevant policymakers for the City.

350.    In the manner described more fully above, the need for policies, training, and supervision of officers on how to handle the use of force on protestors was so obvious, and the inadequacy so likely to result in the violation of

constitutional rights, that the policymakers of the Defendant City can reasonably be said to have been deliberately indifferent to the need.

351.   As a direct and proximate result of Defendants' actions, Plaintiffs' and class members' constitutional rights were violated, entitling them to relief.

## Count IV: 42 U.S.C. § 1983 – Failure to Intervene

352.   Plaintiffs incorporate each of the paragraphs in this Complaint as if restated fully herein.

353.   In the manner described more fully above, during the constitutional violations described herein, one or more of the Defendant Officers stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

354.   The misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of the Defendant City. The policies, practices, and customs of the Defendant City were the moving force behind the misconduct described in this Count and the violation of Plaintiffs' and class members' rights.

355.   The Defendant City is liable because the violation of Plaintiffs' and class members' rights as described in this Count was caused by the policies, practices, or customs of the relevant policymakers for the City.

356.   In the manner described more fully above, the need for policies, training, and supervision of officers on how to handle the use of force on protestors was so obvious, and the inadequacy so likely to result in the violation of

constitutional rights, that the policymakers of the Defendant City can reasonably be said to have been deliberately indifferent to the need.

357. As a direct and proximate result of Defendants' actions, Plaintiffs' and class members' constitutional rights were violated, entitling them to relief.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs seek judgment as follows:

358. An order certifying each class defined herein pursuant to the Federal Rules of Civil Procedure 23(b)(2) and (3);

359. An order appointing the named Plaintiffs as class representatives and their undersigned counsel as class counsel;

360. A preliminary and permanent injunction restraining Defendants from engaging in the unlawful and unconstitutional actions detailed above and retaining court jurisdiction to enforce the terms of the injunction;

361. A declaratory judgment that Defendants' conduct detailed herein was a violation of the rights of the Plaintiffs and class members under the United States Constitution;

362. Compensatory damages for Plaintiffs and the class they represent for the violations of their federal constitutional rights, pain and suffering;

363. An award of attorneys' fees pursuant to 42 U.S.C. § 1988, and costs;

364. Pre- and post-judgment interest as permitted by law;

365. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury pursuant to Federal Rule of Civil

Procedure 38(c) on all issues so triable.

Respectfully submitted,

/s/ Elizabeth Wang

| | |
|---|---|
| Elizabeth Wang | Tara Thompson |
| Daniel M. Twetten | LOEVY & LOEVY |
| LOEVY & LOEVY | 311 N. Aberdeen St. |
| 2060 Broadway, Suite 460 | Chicago, IL 60607 |
| Boulder, CO 80302 | O: 312.243.5900 |
| O: 720.328.5642 | tara@loevy.com |
| elizabethw@loevy.com | |
| dan@loevy.com | |
| *Counsel for Plaintiffs* | |

## CERTIFICATE OF SERVICE

I, Elizabeth Wang, an attorney, hereby certify that on July 23, 2020, I served the foregoing on all counsel of record electronically via CM/ECF.

/s/ Elizabeth Wang